## MITCHELL FINNEGAN v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

In Banc, July 2, 1912.

1. **NEGLIGENCE: Instruction: Lookout for Lights.** Where plaintiff was the engineer of a train which ran into another about to enter upon a branching line at a point where there were target lights, and plaintiff testifies that he did not see the lights and did not look for them, and excuses his failure to do so by testifying that his train had nothing to do with them, and there is evidence that the rules of the company required him to see them and to stop unless the signals were right and the track clear, and that he could have seen the lights had he looked, the defendant was entitled to have the jury say whether his failure to look for the light was negligence and the occasion of the collision, although it be conceded that he had his train under control; and it was error to refuse an instruction submitting that defense. And the point was not covered by another instruction given for defendant and set out in the opinion.

*Held,* by KENNISH, J., dissenting, with whom VALLIANT, C. J., and WOODSON, J., concur, that the refused instruction was objectionable in form for the reason that no rule of the defendant required plaintiff engineer "to watch for the light in the switch stand," and for the reason that in its

concluding clause it assumed as a matter of law the correctness of defendant's contention, that the semaphore light being white, did not relieve the plaintiff of negligence, although it was maintained by plaintiff that under the testimony it did; and every material right of defendant was embraced in other instructions given at its request, although one of them was more favorable to it than it was entitled to.

2. ———: **Train Under Full Control: At Point of Danger.** The rule of the defendant read: "All trains will approach Cole Junction under full control." At a point a little east of the small telegraph office the main line branched into two, the branch going northwest and the main line west, and a west-bound freight train was about to move from the main line onto the northwest branch when an east-bound train on the main line on which plaintiff was engineer crashed into it. In the telegraph office defendant had a semaphore or order board on which were displayed signal lights; a red light signifying that plaintiff should stop his train, and a white light that he could proceed. *Held*, that the rule meant that plaintiff should have his train under control at the point of juncture, east of the telegraph office; and though it be conceded the order board displayed a white light, yet as plaintiff himself testified that he slowed down to twelve miles an hour at a point 1200 or 1500 feet west of the semaphore, and then observing the white light, released the air, took off his brakes, opened the throttle and by the time he had reached the junction had increased his speed to eighteen to twenty miles an hour, and that where air is once released time is required for an additional supply of air before the brakes can again be successfully applied, he was guilty of contributory negligence that bars a recovery for his consequent personal injuries, unless the rule requiring all trains to be under full control at the point of the junction had been abrogated.

*Held*, by KENNISH, J., dissenting, with whom VALLIANT, C. J., and WOODSON, J., concur, that it is not the province of the court to consider the weight of the testimony, but only its tendency to prove issuable facts, and then only such testimony as is favorable to plaintiff's case, and that instead of searching out the testimony most favorable to the demurrant and most unfavorable to the plaintiff, the rule requires exactly the opposite; that, as the testimony for plaintiff tended to prove that the rule requiring all trains to approach Cole Junction under full control, meant, and had been so construed in the operation of trains, that the engineer should have his train approaching the junction under full control until and when he came in view of the

order board, and unless the light in the order board was
red and if he had been given a clearance order at the
station thirty-three miles west, as he had been, it was his
right to speed up before reaching the junction point, and in
such case he was not required to continue under full con-
trol until he had passed that point; and as there was
abundant testimony tending to prove that plaintiff had his
train under full control when he approached Cole Junc-
tion and saw the white light on the order board, and that
his increase of speed thereafter until the collision was
not in violation of the rules as understood and followed
by plaintiff and other engineers, the question of his con-
tributory negligence and right to recover was one for the
jury to settle, under the proper instructions given.

3. ———: ———: **Rule of Company: Abandonment.** A rule of
the company requiring "all trains to approach Cole Junction
under full control" is reasonable and is to be obeyed by engi-
neers, and those having knowledge of it and neglecting to obey
it cannot recover for personal injuries received in running their
trains, unless its violation was condoned by the superior of-
ficers of the road after they had actual knowledge of its viola-
tion, or unless it was so universally and notoriously violated
for such a length of time after its promulgation as would
raise the presumption that they knew of such violation and
acquiesced therein; and the burden is on the engineer who is
shown to have had knowledge of the rule to show that the
superior officers had such knowledge. And in this case the
evidence is reviewed and held to be insufficient to show such
actual or presumptive knowledge on the part of the superior
officers.

*Held*, by LAMM, J., concurring, that, it being suggested *ore*
*tenus* and not denied that defendant's rule relating to the
stopping of trains at said junction was not a new rule, but
had been in existence for several years prior to the date
indicated by the present record, it is of importance, if that
be a fact, whether the rule had received a practical con-
struction which, to the knowledge of defendant, the en-
gineers were acting upon, or had been waived by defend-
ant's acquiescence, and that rule being a prominent fact
in the case, the judgment should not be reversed outright,
but reversed and the cause remanded for a new trial, in
order that that fact may be developed.

*Held*, by BROWN, J., concurring, that all the evidence, as to
the abandonment of the rule requiring all trains to run
into Cole Junction under full control, is set at naught by
plaintiff's own admission and testimony that he had re-
ceived through the hands of the conductor, at a station
thirty-three miles west, a message to go into Cole Junction

very carefully and under full control; and that message re-
vived the rule as tc him, even if it had been abandoned; and
as the night was dark and with the light of his engine he
could not see further than one hundred feet along the
track, and he approached the junction at twelve miles an
hour, he did not have his engine under full control and
should not be permitted to recover.

*Held*, by KENNISH, J., disssenting, with whom VALLIANT, C.
J., and WOODSON, J., concur, that, if the company's
rules are construed in accordance with plaintiff's testi-
mony, they were not violated and the company's knowledge
that they were not observed is immaterial; and that if
they are to be construed in accordance with the testi-
mony of defendant's witnesses, then there is ample testi-
mony from which the jury might have inferred knowledge
on the part of the superior officer and the conductor, who
as to this matter, was the company's vice-principal, that
the rules were not observed and had not been for a long
time. and in such case the rules cannot be invoked as a
defense.

*Held*, by WOODSON, J., dissenting, that the verdict ($25,000)
is excessive, and the same passion and prejudice which
caused the jury to assess excessive damages may have
and did influence them to find that defendant was liable
on the facts, and that in order that there may be a fair
trial the cause should be remanded.

4. ———: ———: ———: **Direction to Run Fast.** A direction
by the defendant railroad company to plaintiff engineer, given
at the time he left a station a hundred and twenty miles west
of Cole Junction, late under the schedule time, to run fast and
make good time, did not amount to a direction to violate a
rule which required all trains to approach Cole Junction under
full control.

5. **APPELLATE PRACTICE:** Remanding Because of Existence
of Facts Not Disclosed by Record. A hiatus in the proof likely
to be supplied by a new trial is a good ground for remanding.
A cause may be remanded for a new trial because of a sug-
gestion, *ore tenus*, and not denied, that certain facts exist which
are not disclosed by the record on an important issue and
which may be supplied in another trial.  [On motion for re-
hearing.]

Appeal from Jackson Circuit Court.—*Hon. H. L.
McCune,* Judge.

REVERSED AND REMANDED.

*Elijah Robinson, Martin L. Clardy,* and *E. J. White* for appellant.

(1)  The trial court should have directed a verdict for the defendant.  The plaintiff was guilty of violating several positive and distinct rules of the company, the observance of any one of which would have prevented the accident.  It is the duty of a railroad company to make rules for the operation of its trains, and a failure to do so has been held to be negligence on its part.  Fletcher v. Railroad, 168 U. S. 135; Railroad v. Orr, 91 Ala. 548; Fordyce v. Briney, 58 Ark. 206; Railroad v. McGraw, 22 Colo. 363; Zeigler v. Railroad, 52 Conn. 552; Murphy v. Hughes, 1 Penn. (Del.) 250; Railroad v. George, 19 Ill. 510; Railroad v. Powers, 74 Ill. 341; Railroad v. Holcomb, 9 Ind. App. 198; Cooper v. Railroad, 44 Iowa, 134; Railroad v. Salmon, 14 Kan. 512; Judkins v. Railroad, 80 Me. 417; Railroad v. State, 51 Md. 268; Reagan v. Railroad, 93 Mo. 348; Schrader v. Railroad, 108 Mo. 322; Rutledge v. Railroad, 110 Mo. 312; Foster v. Railroad, 115 Mo. 165; Rutledge v. Railroad, 123 Mo. 121; Francis v. Railroad, 127 Mo. 658; Doing v. Railroad, 151 N. Y. 579; Morgan v. Railroad, 133 N. Y. 670; Berrigan v. Railroad, 131 N. Y. 582; Railroad v. Lavalley, 36 Ohio St. 222; Nutt v. Railroad, 25 Ore. 294; Lewis v. Seifert, 116 Pa. St. 628; Railroad v. Hinzie, 82 Tex. 623; Pool v. Railroad, 20 Utah, 210; Madden v. Railroad, 28 W. Va. 610; Luebke v. Railroad, 59 Wis. 127.  Plaintiff was perfectly familiar with the rules and knew that they were adopted for greater safety in the operation of trains; and his wilful failure to obey them constituted such negligence on his part as to preclude a recovery for the injuries he sustained.  Brooks v. Railroad, 47 Fed. 687; Railroad v. Nickels, 50 Fed. 718; Railroad v. Dye, 70 Fed. 24; Railroad v. Craig, 80 Fed. 488; Railroad v. Markee, 103 Ala. 160; Railroad v. Williamson,

114 Ala. 131; Railroad v. Free, 97 Ala. 231; Pryor v. Railroad, 90 Ala. 32; Railroad v. Hammond, 58 Ark. 324; Fordyce v. Briney, 58 Ark. 206; Sloan v. Railroad, 86 Ga. 15; Railroad v. Kitchens, 83 Ga. 83; Railroad v. Mapp, 80 Ga. 631; Railroad v. Bragonier, 119 Ill. 51; Abend v. Railroad, 111 Ill. 202; Railroad v. Kastner, 80 Ill. 572; Railroad v. Zerwick, 74 Ill. App. 670; Matchett v. Railroad, 132 Ind. 334; Railroad v. Utz, 133 Ind. 265; Railroad v. Lang, 118 Ind. 579; Railroad v. Whitcomb, 111 Ind. 212; Sedgwick v. Railroad, 76 Iowa, 340; Thoman v. Railroad, 92 Iowa, 196; Alexander v. Railroad, 83 Ky. 589; Herman v. Railroad, 11 La. Ann. 5; Gordy v. Railroad, 75 Md. 297; Foss v. Railroad, 170 Mass. 168; Benage v. Railroad, 102 Mich. 72; Karrer v. Railroad, 76 Mich. 400; White v. Railroad, 72 Miss. 12; Railroad v. Rush, 71 Miss. 987; Francis v. Railroad, 110 Mo. 387; Gorham v. Railroad, 113 Mo. 408; Schaub v. Railroad, 106 Mo. 74; Zumwalt v. Railroad, 35 Mo. App. 661; Towner v. Railroad, 52 Mo. App. 648; LaCroy v. Railroad, 132 N. Y. 570; Shields v. Railroad, 133 N. Y. 557; Mason v. Railroad, 114 N. C. 718; Wolsel v. Railroad, 33 Ohio St. 227; Railroad v. Wilson, 88 Tenn. 316; Railroad v. Smith, 89 Tenn. 114; Murray v. Railroad, 73 Tex. 2; Railroad v. Gray, 65 Tex. 32; Railroad v. Lucade, 86 Va. 390; Darracott v. Railroad, 83 Va. 288; Robinson v. Railroad, 40 W. Va. 583; Eastburn v. Railroad, 34 W. Va. 681. (2) The court committed error in permitting plaintiff's witness Hoffman to testify as to what plaintiff's duty was when approaching Cole Junction, for the reason that his duty was prescribed by the rules, and the rules were the best evidence. (3) The court committed error in permitting Hoffman to testify as to whether plaintiff handled his train at Cole Junction in the usual and customary manner, because no general custom was shown. (4) The court committed error in permitting Hoffman to testify as to what was usually done by engine

men in approaching Cole Junction, because his testi-
mony shows conclusively that he had no personal
knowledge on the subject, never having seen a train
approach Cole Junction. Hearsay testimony is always
inadmissible. (5) The court committed error in giv-
ing plaintiff's instruction 4, for the reason that there
was not a particle of evidence in the case tending to
show that the rules applicable to operation of trains
at Cole Junction had ever been abrogated or aban-
doned. Plaintiff's own evidence shows that he knew
the rules were still in effect. (6) The court committed
error in refusing defendant's instruction 4. If plain-
tiff approached Cole Junction in violation of the rules
of the company, then in force, and the accident was
caused by reason thereof, he was not entitled to re-
cover. See authorities under point 1. (7) The court
committed error in refusing defendant's instruction 7.
See authorities above cited. (8) The amount of the
damages was grossly excessive. Partello v. Railroad,
217 Mo. 645; Baker v. Stonebraker, 36 Mo. 338; Spohn
v. Railroad, 87 Mo. 84; Ice Co. v. Tamm, 90 Mo. App.
202; Adams v. Railroad, 100 Mo. 555; Cook v. Rail-
road, 94 Mo. App. 425; Whalen v. Railroad, 60 Mo. 323;
Adams v. Railroad, 100 Mo. 555; Nichols v. Glass Co.,
126 Mo. 55; Furnish v. Railroad Co., 102 Mo. 438;
Chitty v. Railroad, 166 Mo. 435.

*Frank P. Walsh* and *E. R. Morrison* for respond-
ent.

(1) Plaintiff did not violate any rule of defendant.
Rules requiring trains to be "under full control" or
"prepared to stop unless switches and signals are
right and track is clear," allow the employee the exer-
cise of judgment and discretion, and whether under
all the facts in this case such rules were violated was
a question for the jury. Hall v. Railroad, 46 Minn.
439; Railroad v. Parker, 131 Ill. 557; Maehren v. Rail-

road, 98 Minn. 951; Yongue v. Railroad, 133 Mo. App. 141; Hunn v. Railroad, 78 Mich. 526. Five witnesses who saw the light at the time of the collision testified that it was clear white and therefore there was no "signal imperfectly displayed." The evidence was that the switch target at the junction switch did not govern an east-bound train and hence plaintiff was not required to notice its absence. The rules should be reasonably construed. Davis v. Railroad, 82 Vt. 24; Railroad v. Leighty, 88 Tex. 604. And are to be construed strictly against the company. Railroad v. Bussey, 95 Ga. 584; Railroad v. Hopkins, 161 Fed. 266. The "go ahead" signal from the rear end of the train, required by the rule was never given until the caboose reached the station. This caboose had not reached the station when the collision occurred. (2) If the rules should have been construed as appellant contends, then by habitual and customary violation with the knowledge, actual and constructive, of appellant, they had been abrogated. Lowe v. Railroad, 89 Iowa, 427; 20 Am. & Eng. Ency. Law (2 Ed.), 109; Railroad v. Caraway, 77 Ark. 405; Haynes v. Railroad, 143 N. C. 154; Barry v. Railroad, 98 Mo. 624. Defendant by its own conduct in imposing inconsistent duties waived a compliance with the interpretation of the rules which it now seeks to enforce. Hayes v. Mfg. Co., 41 Hun, 407; Brown v. Railroad, 111 Ala. 275; Railroad v. Roney, 89 Ind. 453; Boyle v. Railroad, 25 Utah, 420. (3) Defendant's instructions 4, 5, 6 and 7, were properly refused. So far as they were proper they were fully covered by other instructions given for defendant. (4) The verdict was reasonable. Markey v. Railroad, 185 Mo. 365; Waldheir v. Railroad, 87 Mo. 37; Gordon v. Railroad, 222 Mo. 516; Hall v. Railroad, 46 Minn. 439; Railroad v. Shelton, 69 S. W. 653; Railroad v. Holland, 18 Ill. App. 418; Railroad v. Connally, 109 N. W. 368; Whitehead v. Railroad, 114 N. W. 254; Snell v. Oil Co., 106 S. W.

170.  (5) The instruction on the measure of damages
was not erroneous.  Partello v. Railroad, 217 Mo. 645;
Railroad v. Bannister, 195 Ill. 51; Coal Co. v. Strine,
217 Ill. 533; Railroad v. Cavanaugh, 35 Ind. App. 32.

GRAVES, J.—Action for personal injuries sus-
tained while in the employ of defendant as one of its
locomotive engineers.  On the night of June 21, 1903
(Sunday), plaintiff was running an engine which was
pulling a freight train from Pleasant Hill to Jefferson
City.  This train was composed of twenty-four loaded
cars and a caboose.  The cars were principally loaded
with live stock.  At Cole Junction, three or four miles
west of Jefferson City, is the junction point of what is
known as the river route and the main line of defend-
ant's railroad.  In other words, at Cole Junction the
river route line leaves the main line of defendant's
road and proceeds through Boonville, Marshall and
Lexington, and thence to Kansas City.  At the time
named the train of the plaintiff, in passing through
Cole Junction, ran into another freight train which
was bound west over the river route, and which at the
time of the collision was in motion and was partially
off of the main line on the river route line.  A good
portion of it, however, was yet on the main line.  In
the wreck which followed the collision of plaintiff's
engine, the fireman and head brakeman were killed,
and the plaintiff quite seriously injured.  The head
brakeman appears to have been on the engine with the
engineer and fireman.  For the injuries sustained the
plaintiff sued for $50,000, and recovered a verdict for
$25,000, and from a judgment on such verdict this ap-
peal was taken.  Numerous grounds of negligence were
alleged in the petition, but the case was submitted to
the jury upon one ground only, which is fairly stated
in plaintiff's second assignment of negligence which
reads thus:

"The defendant, its agents, servants and vice-principals, carelessly and negligently failed and neglected to so arrange the lights on the order board at Cole Junction that a red light would be shown to the plaintiff, when they knew, or by the exercise of ordinary care might have known, that said west-bound freight train had not cleared the main track upon which the train of the plaintiff was approaching."

The instruction which submitted the question of negligence to the jury reads:

"The court instructs the jury that if you believe and find from the evidence that on the 21st day of June, 1903, it was the duty of the plaintiff in the course of his employment, as an engineer of defendant, to run his train through Cole Junction without stopping; that at the time he was approaching said Cole Junction there was a west-bound freight train upon and occupying the main track upon which the train of plaintiff was approaching; that the operator at Cole Junction knew, or by the exercise of ordinary care might have known, that said west-bound freight train was upon and occupying the track upon which the train of the plaintiff was approaching; that at said time defendant had a signal board at Cole Junction for the purpose of displaying signal lights, a red light, under the rules and customs of defendant signifying that plaintiff should stop, and a white light signifying that he should proceed; that at said time it was the duty of the operator at said Cole Junction in the course of his employment to so arrange the said signal lights that a red light should be shown to the plaintiff; that said operator failed and neglected to so arrange the signal lights on the order board at Cole Junction that a red light would be shown to the plaintiff, but so arranged said signal lights that a white light was shown to the plaintiff, and that said act on the part of said operator, if you so find, was negligent and careless; and

if you further believe and find from the evidence that by reason of the negligence and carelessness, if any, of said operator, as submitted to you above, the plaintiff did not stop his said train, but proceeded onward, and that the trains in question were thereby caused to come into violent collision with each other and plaintiff was injured thereby, and that the plaintiff was at the time in the exercise of ordinary care himself; then your verdict should be for the plaintiff.''

The evidence is exceedingly voluminous, but as the plaintiff has limited his submission to the one ground of negligence, the record is to some extent simplified and shortened.

The answer is in effect a general denial and a plea of contributory negligence. Reply a general denial.

Numerous errors are complained of by the defendant, and among them it is vehemently urged that the trial court erred in not giving a peremptory instruction for the defendant. This will call for a fuller review of the facts before closing the opinion. Upon some of the points in issue the evidence is hopelessly conflicting, and in some instances such direct conflict is found as would almost bespeak perjury upon one side or the other. Now as to the things shown by the mass of testimony. Plaintiff was an experienced engineer, and familiar with the conditions in and about Cole Junction. Plaintiff's train was a regular freight train, known as No. 76. On the day in question it left Pleasant Hill, Missouri, late under its schedule time, and with the instruction to make good time. The train was due at Cole Junction at about 8:50 p. m., and arrived there a few minutes late. The situation around Cole Junction becomes material. Plaintiff was, as indicated, coming into Cole Junction from the west. At Cole Junction was an exceedingly small house used for a telegraph station. To the northwest of it was the section house. To the west of it was a double sema-

phore, by which the telegraph operator from his room was able to throw either a red or white light to the west, or the same kinds of lights toward the east. To the west of Cole Junction there is a curve in the main line of defendant's tracks, so that this semaphore sign is not visible until the engine gets within about 1200 feet of the station. To the east of the station a short distance was the point where the river route line diverged from the main line. At or near this point were two switch targets, which would show either red or green accordingly as they had been set for the occasion. These two switch targets with their lights were so situated that when the west-bound train was being pulled in from the main line to the river route line, these lights would be obstructed by the cars in the train. From the evidence it further appears that west of Cole Junction on the main line there is an upgrade, so that in coming in from the west a train would be coming down grade. It had rained that afternoon and was misting rain when the accident occurred. It was exceedingly dark.

Plaintiff says that the headlight on his engine would only light the track for about 100 feet from the engine; that it was an oil lamp. At Tipton he received a message saying that trains 16 and 15 had passed Cole Junction. There were two passenger trains on the river route, one east-bound, due at Cole Junction at 12:10, and the other west-bound, due at Cole Junction at 1:10 in the day time. Plaintiff in testifying as to how he approached Cole Junction with his train, said that he had been running something like thirty-five miles per hour, but that he put on the air brakes (all cars upon his train were fully equipped with air) and slowed down to twelve miles an hour and was running at that rate when he came in sight of the semaphore; that when he saw the semaphore the light shown therein was white and he released his brakes and increased

his speed and was running eighteen or twenty miles per hour just before he ran into the other train. The other train men with him said he slowed down to fifteen miles per hour and then increased the speed. The stockmen on the train, some four in number, say there never was a decrease in the speed and that plaintiff ran his train around the curve and into the other train at a rate of thirty to thirty-five miles per hour. This and practically all of the really disinterested testimony shows the latter state of facts. The trainmen with plaintiff on the train corroborate plaintiff in the statement that the semaphore revealed a white light, and there is some other slight evidence to the same effect. The stockmen who were in the caboose and who got out of it shortly after the wreck say that when they looked at the semaphore the light was red. They also testify to hearing a talk between the conductor and brakeman in the caboose just after the accident to the effect that there was a red signal and the engineer had run into the station without observing the red signal. There is some evidence that the signal was partly red and partly white. None of this testimony goes to the exact time when the engineer came in sight of the semaphore, but all goes to a time just after the collision, which time varies under the evidence, the stockmen in a few minutes thereafter and some others. later thereafter.

Plaintiff says that the switch lights to the east of the station house had nothing to do with the running of his train, but the great mass of the evidence shows that they were factors to be seriously considered. Much of this testimony can best be considered and detailed in connection with the points discussed in the course of the opinion. The defendant introduced a number of rules of the company, some which we will quote.

In February, 1903, the defendant issued a new time card and in it was the following rule for train-

men: "All trains will approach Cole Junction and the cross-over just west of the end of the double track at Independence, under full control." Plaintiff had this time card and says he was familiar with this rule.

In 1901 the defendant adopted and published a set of rules known as standard rules, which appear to be about the same as used upon railroads generally, with some exceptions. Rule 27 reads: "A signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown, must be regarded as a *stop* signal, and the fact reported to the superintendent." Rule 98 reads: "Trains must approach the end of double track, *junctions,* railroad crossings at grade, and drawbridges, prepared to stop, unless the switches and signals are right and the track clear."

Much testimony was introduced upon each side as to the meaning of these rules, as well as testimony the purpose of which was to show that such rules had been abrogated by custom or had not been so abrogated by custom. The sufficiency and character of this we leave for discussion in the proper place. This will suffice for a general outline of the case, leaving the network as gleaned from the evidence to be woven into the opinion.

I. Defendant urges that the court erred in refusing to give instruction numbered 7, as requested by it, and for that reason the judgment should at least be reversed and remanded. We think there is substance to this contention. Refused instruction numbered 7 reads:

"The court instructs the jury that if you believe from all of the evidence in this case that it was the duty of plaintiff, when approaching the junction of the main line and river line tracks, at Cole Junction, to watch for the light in the switch stand at the point of the junction of said two tracks and to stop if he could

not see said light, and if you further believe from the evidence in the case that he failed to look for the light in the switch stand at said junction point, and that such failure in any way directly contributed to the accident in question, then plaintiff is not entitled to recover, and it is your duty as jurors to return a verdict for the defendant, notwithstanding you may further believe from the evidence in the case that the order board at Cole Junction was out of repair and the light therein showed white, and that the train dispatcher, the telegraph operator at Cole Junction, and the members of the crew of the other train were also guilty of negligence.

"The term 'negligence,' as here used, means the failure to exercise reasonable care."

Plaintiffs testimony was to the effect that the switch target lights at the junction did not affect his train and for that reason it is argued that he did not have to look for them. On the other hand, the testimony in behalf of defendant is to the effect that it was incumbent upon plaintiff to look out for those lights, and in the event it was wrong, it was his duty to stop. And further in the event the light was not to be seen it was his duty to stop. One of these targets was at the point where the river route left the main line. By the light on this target, if adjusted and right, it would be indicated whether or not the switch was set for the passage of main line trains or set for the passage of river route trains from the main line to the river route line. Defendant's testimony is strongly to the effect that it was the duty of the plaintiff and all engineers coming in from the west to keep a lookout for the lights at this target and if they could not be seen, then it was his duty to stop before running into the switch. The evidence is that these lights, unobstructed, could have been seen practically from the curve mentioned in our statement and at least from 600 to 700 feet.

The plaintiff in his testimony says: "I never paid any attention to those switches at that end of the yard, because they did not affect that train." And again when asked if he could not have seen the switch light if the other train had not been there, he said: "Yes, sir; if I had been looking for it; but I would not have been looking for it." And so throughout his testimony. He thus admits he did not look for these signals, and excuses himself on the ground that they did not affect his train, and he did not have to look for them. Defendant's testimony is to the contrary. According to it, he and all engineers should watch for these lights; that such signals did affect his train, and if he looked and did not see the lights, the absence of the lights was within itself a signal to stop, before running through the switch. Under this state of the evidence. there can be no question that the defendant was entitled to this instruction.

Plaintiff urges that the same matter is covered by instruction numbered 10 given for the defendant. We do not so think. Instruction numbered 10 reads:

"The court instructs the jury that if you believe from the evidence in the case that the rules of the defendant, in force on June 21, 1903, applicable to trains approaching the junction point of the main line track and the river line track at Cole Junction, required engineers to approach said junction point with their trains under full control and prepared to stop if the switch at said point was not right and the track at said point was not clear; and if you further believe from the evidence in the case that the plaintiff did not observe and obey said rules, but approached the junction point of said two tracks not prepared to stop and without looking for the switch light at said junction point of said two tracks, and by reason thereof ran into the side of the other train, then he was guilty of negligence and is not entitled to recover in this case, and it

is your duty as jurors to return a verdict for the defendant."

This instruction is directed more to the question of the control of the train than to any other question. But giving it the broadest possible view, it can only be said that it predicates a finding for the defendant on a combination of two things, (1) a failure to have the train under such control as to be able to stop, and (2) "without looking for the switch light at said junction." The evidence is conflicting as to whether or not the plaintiff did have this train under control in approaching this junction. Suppose as a fact the train was under such control that it could have been stopped before running into this switch, had plaintiff looked for and seen these switch lights: wouldn't the defendant then have been entitled to instruction number 7, and not to the one which was given? We think so. The refused instruction only in effect concedes (by eliminating the question) that the train was under control, and predicates a recovery for the defendant on the ground that plaintiff failed to look for the target lights, if the jury found it was his duty to look for them. Plaintiff admits he did not look for them, and the instruction refused would have compelled the jury to say whether or not under all the evidence it was his duty to have looked for such lights.

Bearing in mind now the evidence that these target lights might have been seen from 600 or 700 feet to a quarter of a mile to the west, and that at such point the absence of these lights could have been seen by plaintiff, let us suppose a case. Plaintiff says he had his train under control at the rate of speed he was running, but we shall leave that out of the supposed case. Suppose plaintiff had been running not to exceed five miles an hour (the rate which defendant's witnesses say that he should have approached this switch or junction), so that there could be no question that he had

his train under full control, yet the defendant would be entitled to the refused instruction. In other words, the defendant was entitled to have the jury say whether or not plaintiff's failure to look for the light was the occasion of the collision, although it be conceded that he had his train under control. Not looking for these lights the plaintiff might have run into the river route train, although his rate of speed was very slow, and his train absolutely under control. Instruction number 10 does not give the defendant that right. Under it the jury was compelled to find not only that plaintiff failed to look for the lights, but further that he "approached the junction point of said two tracks not prepared to stop," whereas the defendant was entitled to a verdict upon plaintiff's failure to look for the lights, if such failure was negligence, and if such failure contributed to the injury of the plaintiff. No other instruction covers this vital point. Instruction number 10 does not meet it. The failure to give instruction number 7 precluded the defendant from a recovery, if the jury found that plaintiff had his train under control, but further found that it was the duty of plaintiff to have been on the lookout for these lights and that he failed so to do, and by such failure was injured. This theory should have been presented to the jury and instruction number 7, refused, properly presented it. Instruction number 10 did not present such a theory. Under instruction ten the jury had to find two things before defendant could recover, i. e., (1) that plaintiff approached the junction of the two tracks "not prepared to stop," and (2) "without looking for the switch light." Whereas under the law the latter alone was sufficient for a verdict for the defendant, provided the jury concluded from the evidence (1) that it was his duty to look out for the switch light, (2) that he did not look as he admits, and (3) that his

failure to look resulted in his injury. By this error
the defendant's chances for a verdict were materially
decreased, and the case will at least have to be reversed
and remanded.

II. It is also urged that there was error in re-
fusing to give instruction numbered 4, as asked by the
defendant, which reads:

"The court instructs the jury that even though
you may believe from the evidence that the light in the
order board at Cole Junction showed white as plaintiff
approached it, still that fact did not justify him in
attempting to run his engine over the point of junction
of the main line track and the river line track, without
having his engine under full control and being pre-
pared to stop, if the switch light at said point was not
right and the track at said point was not clear."

This instruction practically goes to the point
raised by the demurrer to the evidence. It concedes
the negligence of the defendant in having a white light
in the order board or semaphore, when it should have
been red. It is at least so near to the demurrer, that
we prefer to discuss the demurrer rather than the in-
struction. Plaintiff's counsel concedes that if the sev-
eral rules of defendant introduced in evidence were in
force, then he has no case, but it is urged that the rules
had been abandoned and superseded by a custom. Such
concession is contained in instruction numbered 4,
asked and obtained by them, which thus reads:

"The court instructs the jury that although plain-
tiff is barred from recovery in this case if his injuries
were caused or contributed to by the violation on his
part of any rule or rules in force on the defendant's
line at said time, and which had not been abrogated or
abandoned by defendant, still if you further believe
and find from the evidence that at and before the time
plaintiff was injured, it was the regular and estab-

lished custom and usage among the engineers of the
defendant to disregard said rule or rules at the point
in question, and that the defendant's superior officers
and representatives in charge and control of said en-
gineers knew of and acquiesced in said usage and cus-
tom, if any, then said rule or rules would be abrogated
at said point."

The question here is had the rules been abrogated
by a generally known usage and custom, which custom
of violating the rules was known to and acquiesced in
by the defendant. The first rule we have is the one on
the time card, which reads: "*All trains will approach
Cole Junction* and the crossover just west of end of
double track at Independence *under full control.*" The
applicable portion we have italicized, and if standing
alone would read: "All trains will approach Cole
Junction under full control." This rule was, so far
as this record shows, only promulgated in the month
of February, 1903, preceding the accident on June 21,
1903. It singles out two points on the line between
Kansas City and St. Louis. That it was adopted and
promulgated because of the dangers at these two points
is apparent from the mere statement of the conditions,
as well as from the direct evidence in the record. In
making the rule it is to be presumed that there was
taken into consideration the surroundings. Now what
were they at Cole Junction? There we have a place
where, according to plaintiff's own statement, another
train was liable to be at any time. There we have a
place where there is neither town nor depot. The only
thing is the junction of these two railroad tracks, a. lit-
tle eight by ten telegraph room, this semaphore oper-
ated from the telegraph room, and nearby a section
house. The actual junction where the danger lurked
was a very short distance to the east of the little tele-
graph office, and the semaphore a little space west.
Plaintiff personally does not deny that the above rule

was in force when his train came in that night. In fact he claims that it was in force and he obeyed it. He claims to have acted upon and under this rule, or rather his construction of the rule. The rule is plain and needs no construction as to the point where he must have his train under control, however different may be the views as to what constitutes "full control." Defendant's witnesses say that by "full control" is meant that the train should be run at such rate as would enable a person to stop the train within the distance which he could, at the time and under the existing conditions, see an obstruction on the track. This appears to us the reasonable view of it, but that is not the question we have in mind now. The question is, at what point this plaintiff should have had his train under "full control." At the point where he could first see the semaphore? Or should it have been at the point of real danger, the junction of the two tracks? A casual reading of the rule shows that the latter point is the one meant. As to this question the rule is plain and needs no proof *aliunde*. Now, under the evidence of the plaintiff himself, did he undertake to have his train under any kind of control at the point designated by the rule? We think not. His own witness Crawford says it was not under control as they passed the telegraph station. Plaintiff says that he put on his air and slackened his speed to twelve miles an hour on this wet down-hill track until he got to a point where he could see the semaphore, a distance of 1200 to 1500 feet to the west of the semaphore. Grant it that his train at twelve miles an hour was under "full control" at that point (a thing somewhat doubtful, to say the least, under the conditions), yet what effort does the plaintiff show to have his train under "full control" at the place mentioned in the rule, i. e., at the junction? He says that when he caught sight of the semaphore he then released the air, took off his brakes, opened the

throttle and by the time he got to the other train and struck it he was going at the rate of eighteen to twenty miles per hour. The conductor, his witness, says twenty-five miles per hour. At no time after he caught sight of the white light in the semaphore, did he make any effort to have his train under "full control" at the crucial point—the junction of the two tracks. On the contrary he says just the opposite. He says that he steamed up and increased his speed. Within a few hundred feet he increased his speed eight miles per hour. According to himself and his witnesses he was "pumping steam" and increasing speed, rather than attempting to have his train under "full control." He also says that where you put on the air once and then release it, time is required for an additional supply of air, before the brakes can be successfully applied, or words to this effect. So that instead of trying to approach this crucial point with his train under "full control" he had done and was doing every thing in his power to the contrary. He had put his air in condition that it would not be immediately effective, and was increasing his speed at a rapid rate. It is straining the credulity of this court to urge that under these conditions testified to by plaintiff himself, we should say that there is evidence in this record to authorize a finding that the plaintiff approached this junction with his train under "full control." The term "full control," has some meaning which can not be entirely overlooked, but for the purpose of this point we need not now digress for a discussion of the term "full control." What we now hold is that this rule required the defendant to approach this junction i. e., the point where these two tracks diverged, with his train under "full control," and that under his own evidence he was not even making an attempt to have his train under "full control" at this point; that having his train under control at the point where he could first see the

semaphore was not a compliance with the plain meaning of the rule. If this rule was in force, the evidence in the record precludes a verdict for the plaintiff, and a verdict for defendant should have been directed by the court.

III. But now going to the alleged abandonment of the rule, let us see how the case stands. In the course of plaintiff's testimony he made the following admissions with reference to this rule:

"Q. I wish you would tell me what was your understanding of that rule? A. To approach Cole Junction at such a speed that you could stop if something was wrong.

"Q. If anything was wrong? A. If anything was wrong.

"Q. *You not only mean the order board, but anything else that might be wrong there, is that the way you understand it?* A. *Oh, yes, sir.*

"Q. Now, Cole Junction is a junction point where the river route leaves the main line, isn't it? A. Yes, sir.

"Q. And there is liable to be trains there at any time? A. Yes, sir; and at any other station.

"Q. By approaching at such speed so that you could look out for anything—that means so you could look ahead of you, and if there was anything there, you were supposed to stop and avoid it? Is that the idea? A. That is it.

"Q. That is, to be able to stop your engine almost at will? A. In a reasonable distance.

"Q. What do you suppose was the reason for making that rule—under full control? A. I do not understand the question.

"Q. What do you suppose was the railroad company's reason for making that rule—to approach there under full control? A. So that it might be observed,

and that a man might reduce speed so that he could stop.''

That plaintiff had full knowledge of this rule printed in italicized letters is shown by the following admissions:

"Q. Your time card had this rule on it in italicized letters at the bottom, did it not (reading: 'All trains will approach Cole Junction and the crossover just west of end of double track at Independence under full control.')?''

Objection by counsel for plaintiff.

"Q. Were you familiar with that?''

Objection.

"A. I know that there was such a rule.

"Q. This was on all the time cards wasn't it?''

Objection.

"Q. All the time cards that you saw? A. Every one had the same time card. I had the time card with a rule on it like that.''

After this admission the time card was admitted in evidence showing the rule in italics or emphasized type, duly signed by the division superintendent and the chief dispatcher. The whole trend of plaintiff's own testimony is to the effect that he knew of and recognized the rule in question, but that what he did on the occasion was a compliance therewith. But this we have mentioned in the preceding paragraph, and our purpose now is to discuss the law and the facts as to an abandonment of this rule under all the testimony.

In business of the character conducted by the defendant, the law charged the defendant with the duty to make rules for the protection of its employees.

In 26 Cyc. 1157, the case law is collated, and the rule of law succinctly announced in this language: "Where a master is engaged in a complex or dangerous business he must adopt and promulgate such rules and regulations for the conduct of his business and

the government of his servants in the discharge of
their duties as will afford reasonable protection to
them.'' The language announced in the text is almost
an excerpt from the case of Reagan v. Railroad, 93
Mo. 348.

With this rule of law staring the defendant in the
face, this and other rules of conduct for the govern-
ment of its employees were adopted. After adopting
the same, does the evidence show that the defendant
knowingly permitted violations of the rules? It must
be borne in mind that the rule we are now discussing
was promulgated February 8, 1903, or about four
months prior to the accident.

The rule of law in this State is thus stated by
GANTT, P. J., in Schaub v. Railroad, 106 Mo. 1. c. 92:
''The uncontradicted evidence in the case is that there
was a rule of the company prohibiting employees from
going between the cars to uncouple them while in mo-
tion, and this rule had been in force for at least three
years, and deceased was shown to have had a copy of
these rules. Indeed they were printed on all of the
'time cards.' In the absence of all evidence that de-
fendant knowingly permitted a violation of this rule,
it is clear that deceased was bound to observe it, and
if he persisted in breaking it, and was hurt in so do-
ing, he could not ask the defendant to make good to
him the loss or injury his own recklessness had caused.
The court committed manifest error in refusing de-
fendant's third instruction. If the deceased violated
said rule, he was guilty of contributory negligence that
will bar his recovery in this cause.''

To like effect is the language of MACFARLANE, J.,
in Francis v. Railroad, 110 Mo. 1. c. 395, whereat he
said: ''It would be most unreasonable and unjust, af-
ter imposing upon the master the duty of promulgating
a rule for securing the safety of his servant, to permit
the servant to recover from the master damages for
injuries which the observance of the rule would have

prevented. As the master is bound at his peril to make the rules, the servant should be equally bound at his peril to obey them. In such case the disaster is brought upon the servant by his own voluntary act, and he, and not the master who had discharged his duty, should bear the consequences. So it has been uniformly ruled.''

On the other hand Judge MACFARLANE in the same case states the rule as to what will amount to an abandonment or abrogation of a rule in this language: ''It has been held by this court that, if there was an established usage on the part of those employees whose conduct a rule was intended to regulate, *known and acquiesced in by their superior officers, to disregard the rule,* one of such employees should not be held guilty of contributory negligence for its violation. [Barry v. Railroad, 98 Mo. 69.]'' The italics in the above are ours.

Speaking to the same question, GRANT, C. J., for the Supreme Court of Michigan, in Fluhrer v. Railroad, 121 Mich. l. c. 217, said: ''The *onus probandi* was then cast upon the plaintiff to show that the company sanctioned a departure from the rule by a custom *so universal and notorious* that the company was presumed to have had knowledge of it and to have ratified it.''

And in the later case of Nichols v. Railroad, 125 Mich. l. c. 398, the same court after citing approvingly the Fluhrer case said: ''We think the charge failed to state the rule correctly, as it did not inform the jury the custom should have been shown to have been *so universal and notorious* that the company is presumed to know it. The charge also spoke of the custom as proved, when it was for the jury to determine from the evidence whether the custom was proven or not.''

In Railroad v. Scanlon, 22 Ky. Law Rep. l. c. 1404, it is said: ''The conductor and fireman, and perhaps a brakeman of the train causing the accident, each tes-

tified that the speed of the train was not above that frequently attained; but they neither show, nor hint at the fact, that these occasional violations were *condoned by the higher officers of the road, or even were known to them.* The tendency of the law has been, and is, to hold common carriers employing the hazardous agencies incident to steam railroad transportation to the highest degree of accountability, going to the extent of requiring them to provide the most modern and improved machinery and appliances in connection with the running of their trains, and holding them responsible to passengers and shippers for every neglect of their servants. They of course can operate their trains only by means of trainmen who perform their duties, under the direction of the employer. Modern conditions of transportation and travel are such as to make it impossible to meet their demands upon the larger railroad systems, without the use of such carefully prepared, and rigorously enforced rules, as will reduce the carrier's work to a well nigh perfect system. The very nature of their business obviously requires that these employees, in the discharge of their respective duties, must themselves feel under some obligation to the public they serve. Not only their own lives, but those of their fellows, and large moneyed interests represented by rolling stock and freight, all call for the exercise by the trainmen of a high degree of caution, as well as a strict observance of those rules found by experience to best conserve their own safety, and that of their charges. The responsible trainman who violates such reasonable rules, of which he has knowledge, and which he has undertaken to regard, must needs take upon himself the personal consequences of his dereliction. If injury results to him by reason of such violation, and which would not, in any probability, have occurred but for it, he alone should suffer the consequences of his fault.'' The italics in

the above are ours, and we make them because it fits the case at bar.

To a very similar effect is the case of Konold v. Railroad, 21 Utah, 379. In that case it is said: "Respondent's counsel, in their brief state that 'it is not denied that it was the duty of conductors and engineers in running their trains to obey the rules and regulations promulgated by their superiors for their guidance, provided that such rules and regulations are reasonable and are enforced,' but claim that the printed rules and time cards of the company were not enforced, but were habitually violated, and that therefore the plaintiff was not bound to obey the same. *The true rule on this subject is that when the rules and regulations established by the master are habitually disobeyed, with the knowledge or express consent of the master, or have been disregarded without his express consent in such a manner, and for such a length of time, as to raise a presumption that the master* (whose duty it is not only to make and promulgate, whenever engaged in a business of such a nature as to require it, suitable rules and regulations for the protection of his servants, but also to use due care and diligence to have then enforced: Pool v. Southern Pac. Co., 20 Utah, 210) *must have become aware of such habitual disregard, and approved the same,* such rules and regulations will be regarded as abrogated." Like the previous quotations the italics in this quotation are ours.

The rule as laid down in 26 Cyc. 1161, is almost a transcript from the Utah case as above.

From it all it may be gathered (1) that infractions of the rule must be known to and acquiesced in by the superior or managing officers of the corporation, or (2) as stated in the Michigan and other cases the infractions of the rule must have been *so universal and notorious and for such length of time,* that the superior or managing officers of the corporation will be presumed to have known of such infractions of the rules and to

have acquiesced therein. In either of such cases the rules will be deemed to have been abandoned or abrogated, and of course would constitute no defense for the defendant.

If there is in this record sufficient evidence tending to bring plaintiff's case within the rule the demurrer was properly overruled. But is there such evidence?

Let us go to the rule we have under consideration. In the first place it had been promulgated but a fraction over four months prior to the accident. Its evident purpose was to obviate accidents at these two most dangerous points on defendant's lines. These points had been singled out from all others and made the subject of a rule. It was promulgated over the names of the chief train dispatcher and the division superintendent. It is hardly reasonable that such superior officers had any intention to abrogate a rule so lately promulgated. But let us see the testimony.

Upon the question of how trains ran through Cole Junction, witness J. L. Fletcher said: "Q. How often did that occur, as you say, that a train would slow down at the curve and then puff up when the light was white and run on through? A. Well, it occurred every short while." This witness had only been around Cole Junction at night for a month and a half before the accident. His knowledge is therefore limited to that time.

George L. Shemwell, a brakeman on the train with Finnegan, and one of the strongest witnesses on the point, said that he had seen a number of trains pass through the junction in the manner that Finnegan did on that occasion, but on cross-examination he could not fix the dates, and his testimony does not show to what extent this practice prevailed from February 8, 1903, the date this rule was promulgated to the date of the injury. He had been running through there every

three days since March, 1902, a part of the time on the river route.

Roy Brunk testifies in general terms, and says there was a general custom to run as Finnegan ran, but his testimony on the point is rendered worthless by his admission upon cross-examination. It shows that he could have had no knowledge of any such custom. His source of knowledge is thus disclosed by the cross-examination:

"Q. When did you begin firing for them? A. I made my first trip on the first day of June, 1903.

"Q. That was twenty days before this accident? A. Yes, sir.

"Q. You quit them in July? A. By request, yes, sir.

"Q. You were discharged? A. Yes, sir.

"Q. So, all you know about an engineer's duties is what you gleaned in that month, riding on the engine with him? A. Well, it was necessary that I should—

"Q. (Interrupting.) Just answer the question, yes or no, is that true or not? A. It was necessary, before I would be permitted to ride on the engine with him, that I pass an examination on the standard rules, which cover the duties of engineers, firemen and all trainmen.

"Q. You were supposed to know the rules applicable to engineers, as well as firemen? A. Yes, sir.

"Q. Well, leaving out the rules, then, and coming down to custom; you didn't pass any examination on what was customary among the men operating trains, did you? A. No, sir; but I had occasion to go over the line several times, and I know what was customary with the men I was with.

"Q. Still, you had only been over it some three weeks when this accident happened? A. Something like three weeks.

"Q. How many times had you been through Cole Junction? A. On the main line, twice.

"Q. With the same engineer? A. Yes, sir.

"Q. So you only know what those two engineers did, then? A. Yes, sir; that is all.

"Q. Did you have a clearance through either time? A. No, sir; had no orders."

Norman Crawford, the conductor on the wrecked train, testified that it was usual for the engineers to slow up until they got their train under control before they got to the point where the semaphore light was visible and then if the light was white to then go ahead, and that to go ahead meant to pick up speed, but he further said:

"Q. Wasn't that a most extraordinary and unusually fast rate of speed for an engineer to run through there with a freight train in the nighttime, regardless of whether the semaphore showed white or red? A. Yes, I guess it was. He was going— . . .

"Q. And you sent along that word to Mr. Finnegan to be careful in running into Cole Junction, didn't you? A. Yes, sir. . . .

"Q. Mr. Briscoe asked you why in the world he ran in there at the rate of speed, and you told him you didn't know, because you had sent him word to run in there slowly? That conversation occurred, didn't it? A. Yes, sir; that is the conversation, the best I can remember. . . .

"Q. Now, Mr. Crawford, you don't think that a rate of speed of fifteen or eighteen miles an hour with such a train as that, and in the nighttime, down hill, on a wet track, was under full control, do you? A. Not right there at the station it was not. When I spoke about the full control it was when she approached the station.

"Q. That is back how far? A. That is when he came around the curve in sight of the station."

His testimony is therefore to the effect that the conduct of Finnegan was unusual.

Briscoe, the conductor on the train which was run

Finnegan v. Railroad.

into, said that it was usual for a train to slow up before coming in sight of the semaphore lights, and have the train so it could be stopped, but if the semaphore light was white, they would then proceed, but he does not say it was usual to increase speed before reaching the junction—the danger point.

F. H. Hamerick, an engineer, who at that time had a suit pending against the defendant, testified that it was customary to increase the speed as soon as the engineer saw the board was white. He says that such a custom prevailed prior to June 21, 1903, but does not undertake to give the details as to what was the extent of the custom from February 8, 1903, to June 21, 1903, the only time which could have any bearing upon this rule. His service with the company began some two years prior to the accident and terminated some two years afterward; in other words, from 1901 to 1905.

Such is the testimony on the infractions of this rule. There is no evidence that the superior officers had knowledge of or acquiesced in these infractions, but on the contrary such knowledge is denied. With the exception of the witness Hamerick, the testimony as to the frequency of the violations of the rule is but fragmentary. It does not show a general custom. Nor do we think that even including the testimony of Hamerick the plaintiff has brought his case within the general rule announced by the authorities, and as we have undertaken to again outline. We are not concerned with a custom prevailing before the promulgation of this rule, nor to conduct after the accident. The rule had been promulgated only four months and thirteen days prior to this accident. Granting, as we must, that whatever custom arose as to this rule, such custom could at most have had but a short existence before this accident. The great weight of the evidence fails to show it to be general, and even if it did, it was not so "universal and notorious and of such long standing" as would raise the presumption that the su-

perior officers knew of the custom and acquiesced therein. This rule could not be violated until it was made. We must seek, therefore, only the evidence going to a custom having its life and birth after February 8, 1903. Prior matters do not tend to show the abrogation of this particular rule. If such practices prevailed prior to 1903, as the testimony of Hamerick and Shemwell might tend to show, the reasonable inference would be that this rule was promulgated to suppress such practices. The validity of this rule at the date of the accident must be measured by the occurrences since February 8, 1903. Under the evidence which we have outlined these occurrences are insufficient to show that the rule was *so universally and notoriously violated for such length of time* as would raise the presumption that the superior officers of the defendant knew of such violations and acquiesced therein. If one of the most important rules in the running of trains can be thus abrogated and annulled by reckless agents in four months time, or less, it would be a hopeless task for a railroad company to comply with that sound policy of the law which compels it to have rules. It must be remembered that these rules are not for the protection of the agents of the company alone, and to be annulled and abrogated by them at their pleasure, but they are to protect the general public and the railroad company as well. The travelling and shipping public have an interest in these rules. The railroad property is protected by them. For these reasons the proof as to the abandonment or abrogation of a rule should be cogent and clear. The proof in this case does not in our opinion measure up to the requirements of the law, and a verdict for the defendant should have been ordered by the trial court.

IV. There are other questions urged by the defendant, and some of them we think tenable, but the views above expressed obviate consideration of them.

Plaintiff urges, however, that the defendant directed him to run fast and make good time. This is true. But that does not mean a direction to violate rules.

Granting it then to be true that the defendant was negligent in not displaying the red light, yet had the plaintiff complied with the rules of the company this accident would not have happened. Had he approached this junction point so that he could have stopped his train without "fouling the switch," to use railroad language, he would have been safe and sound, and two of his fellow workers might have been alive. The very purpose of these rules is to have a double check on these disasters. It was no doubt considered by the railroad officials that some careless operator might overlook the hoisting of the red signal at a junction, and in the event he did, the rules if followed would still avert the loss of life, limb and property. It is not only proper to take such cautions, but at junctions of this character it might be negligence not to have a double check upon disaster.

Upon the whole we are of opinion that the negligence of the plaintiff precludes his recovery, and the judgment *nisi* should be reversed. Putting the shoe upon the other foot, had one of the stockmen in the caboose been injured or killed in this wreck no court or jury would have held that this plaintiff was guilty of no negligence, and thereby saved the defendant from damages. Let the judgment be reversed.

GRAVES, J.—This case has reached a peculiar situation in this court. Three of us are of opinion that there is no case made for plaintiff upon the facts. FERRISS, J., concurs with the views expressed by GRAVES, P. J., in Division One, and BROWN, J., concurs in the result of the divisional opinion, but for reasons of his own expressed in a separate opinion by him filed. KENNISH, J., in an opinion filed, reached the conclu

sion that the judgment should be affirmed, in which opinion, VALLIANT, C. J., concurs. ·WOODSON, J., in an opinion filed, concurs in much that is said by KENNISH, J., but is of opinion that the case should be reversed and remanded on the ground of excessive verdict. LAMM, J., in an opinion filed, concurs in the reasoning of the divisional opinion, but thinks the case should be remanded, to the end that plaintiff might be per· mitted new evidence upon the question as to when a given rule was promulgated and adopted. The result is we have no opinion. Three of us say there is no case for the plaintiff, and three of us say that there is a case for the plaintiff, and one says that there may be a case for the plaintiff upon a further showing. Those of us who think there is no case for plaintiff have not considered the size of the verdict, that being imma- terial in our view of the facts. As expressing our dif- ferent views the several opinions mentioned will be filed, including the divisional opinion.

To the end that there may be a disposition of the case here at this time, we consent that the case may be remanded, but at the same time adhere to our views upon the merits as expressed in the divisional opinion of GRAVES, P. J., and of BROWN, J., written in Banc. Under the circumstances, we deem this the best dis- position to make of the case.

*Ferriss* and *Brown, JJ.,* concur in these views.

## CONCURRING OPINION.

LAMM, J.—I concur in so much of the opinion of my learned brother GRAVES, as relates to error in in- structions: As to reversing without remanding, this view of·it seems just to me:

In Banc it was suggested *ore tenus* (and not de- nied) that defendant's printed rule relating to the junc- tion in question was not a new rule, or fresh order, but had been in existence for several years prior to the

date indicated by our present record and had appeared in defendant's former publications of its rules. If this be a fact, it is of importance on the question whether the verbiage of the rule (to the knowledge of defendant) had received a practical construction, which the employees were acting on, or had been waived by defendant's acquiescence. The rule is a prominent fact in this case, and this court, before finally cutting off plaintiff's right to recover, should know the truth in that regard.

A new trial will develop the facts and the cause should be remanded for such new trial.

### CONCURRING OPINION.

BROWN, J.—I concur in the opinion of brother GRAVES filed in this case.

The plaintiff contends that whatever rules the defendant had published requiring trains to approach Cole Junction "under full control" had been abandoned by defendant by permitting its employees during a long period of time to run trains through said junction at a speed of twelve or more miles per hour, unless the main train signal or semaphore was thrown so as to show the red light or stop signal.

From a careful reading of plaintiff's evidence, I am convinced that he did not so understand the rules.

Plaintiff testified that the headlight on his engine only enabled him to see objects on the track 100 feet away; yet he ran his train into Cole Junction at such speed that he could not stop his train in less than five or six hundred feet. His testimony on that point is as follows:

"Q. Your time card had this rule on it in italicized letters at the bottom, did it not (reading): 'All trains will approach Cole Junction and the crossover just west of end of double track at Independence under full control?' . . . A. I know there was such a rule. . . .

"Q. Now, Cole Junction was a very insignificant place, except the fact that it was a junction point? A. There was no town there.

"Q. No town, and no freight house? A. *No, sir; but there was always orders there.*

"Q. What do you understand this rule to mean here that says you must not pass those junctions unless the signals and switches are in good condition? A. I will ask you to read the rule just the way it is, if you please, Judge.

"Q. (Reading) 'Trains must approach the end of double track, junctions, railroad crossings at grade, and drawbridges, prepared to stop, unless the switches and signals are right and the track is clear.' A. The switches and signals are right?

"Q. Yes—and the track is clear. Now, what do you understand by that? A. Why, if a man went down there and the switch was wrong and he saw it, he would stop.

"Q. Well, what do you understand the rule to mean when it says he must be prepared to stop unless the signals and switches are right and the track is clear? A. He ought to stop.

"Q. Now, I will ask you if you remember these questions and answers in your deposition, which was taken on the 12th day of September—last September (reading): 'Question: I wish you would tell me what was your understanding of that rule? Answer: To approach Cole Junction at such a speed that you could stop, if something was wrong.' Q. Didn't you answer that question that way? A. Yes, that is right too.

"Q. Now, you were referring to the rule at the foot of the time card then, weren't you? A. That is the way I understood it.

"Q. Yes; that rule had just been called to your attention in your deposition? (Reading): 'Question: If anything was wrong? Answer: If anything was wrong? Question: You not only mean the order board, but anything else that might be wrong there? Is that the way you understand it? Answer: Oh, yes sir.' Q. You answered it that way, didn't you? A. Stop for anything that is wrong at any other point too. Any obstruction on the track at any point that you saw would cause a man to stop.

"Q. (Reading): 'Question: Now, Cole Junction is the junction point where the river route leaves the main line, isn't it? Answer: Yes, sir.' Q. You answered that that way, didn't you? A. If I did not that is the way I should answer.

"Q. And the question above that which I read, and to which you said, 'Oh, yes,' you answered that way? A. Yes, sir.

"Q. (Reading): 'Question: And there is liable to be trains there at any time? Answer: Yes, sir; and at any other station.' Q. You answered that that way? A. Yes, sir.

"Q. (Reading): 'Question: By approaching at such speed so that you could look out for anything—that means, so that you could look ahead of you, and if there was anything there, you were supposed to stop and avoid it? Is that the idea? Answer: That is it.' Q. You answered that question that way, didn't you? A. Yes, sir.

"Q. (Reading): 'Question: That is, to be able to stop your engine almost at will? Answer: In a reasonable distance.' Q. You answered that that way, didn't you? A. Yes.

"Q. Now, what kind of a night was it? A. Very dark night—rainy.

"Q. Was it cloudy? A. Raining.

"Q. Raining at that time? A. Yes, sir."

Plaintiff testified that it was his duty to approach all stations under such control that he could stop if he received a signal to do so; and as this was undoubtedly his duty under the general rules of the company, the special rule requiring him to approach Cole Junction "under full control," is absolutely meaningless, if he was authorized, as he claims, to run into that station at twelve miles an hour.

Plaintiff testified that he received at Tipton Station a message from defendant's train dispatcher informing him of two certain passenger trains that had cleared Cole Junction; and that said telegram indicated that there would be no obstruction on the track at

Cole Junction. However, this testimony, as well as the testimony of plaintiff to the effect that the rule requiring him to approach Cole Junction "under full control," had been abandoned, is set at naught by a subsequent admission by plaintiff in his evidence that at the time of receiving the message regarding the passenger trains, he also received a warning to approach Cole Junction with that particular train very carefully and "under full control." On this point, plaintiff testified as follows:

"Q. Did you get any word from Mr. Crawford, the conductor—did you get any communication from the conductor with that slip of paper or message that was delivered to you by Mr. Atkinson? A. Yes, sir. Q. What was it? A. He said—'now, you see I have to say what somebody else told me.' Q. Well, I will ask you the question, and then you can get at it that way, and then you won't be in danger of telling anything that is objectionable. Didn't you get a communication from Mr. Crawford to go into Cole Junction very carefully and under full control? A. Yes. Q. You got that communication along with this message? A. Yes, sir."

Even if plaintiff had been permitted in the past to run through Cole Junction at 12 miles an hour, this last message undoubtedly had the effect of reviving the rule which he claims had been abandoned, so far as the running of that particular train was concerned; otherwise, such an order would not have been transmitted to plaintiff. In my judgment, the warning gave notice to plaintiff to look out for obstructions on the track at Cole Junction on that particular night.

The plaintiff and other railroad employees differ very much as to what is meant by the words, "under full control," but as applied to this particular train on that particular dark, rainy night, I think it clearly meant that plaintiff should, regardless of signals, have kept his train under such complete control that he

could stop after he saw the cars on the track in time to prevent a collision.

That the plaintiff was running his train into Cole Junction on the night of the injury at least five times as fast as the rules of the company and the warning he received at Tipton authorized him to run, is proven to my entire satisfaction by the evidence from plaintiff's own lips. His recklessness in this regard endangered the lives of many other persons, besides the property of the company for whom he was employed; and his negligent acts resulted in the killing of two men under circumstances that in my judgment amounted to manslaughter.

Entertaining these views, I am of the opinion that the plaintiff should be denied a recovery in this action.

## DISSENTING OPINION.

KENNISH, J.—The foregoing opinion holds that prejudicial error was committed against the defendant (1) in the refusal of the court to give certain requested instructions, and (2) in the refusal of an instruction at the close of the evidence, directing a verdict for the defendant. The conclusion thus reached as to the first error would result in reversing the judgment and remanding the cause for a new trial, while under the second the verdict of the jury is not only set aside and the judgment thereon reversed, but the plaintiff is denied the right to have a jury again to pass upon his case. I respectfully dissent as to both propositions.

I. Appellant contended that error was committed in the refusal of its instruction numbered 7, and that contention this court sustains. That instruction is as follows:

"The court instructs the jury that if you believe from all of the evidence in this case that it was the duty of the plaintiff when approaching the junction of

the main line and river line tracks, at Cole Junction, to watch for the light in the switch stand at the point of the junction of said two tracks, and to stop if he could not see said light, and if you further believe from the evidence in the case that he failed to look for the light in the switch stand, at said junction point, and that such failure in any way directly contributed to the accident in question, then plaintiff is not entitled to recover, and it is your duty as jurors to return a verdict for the defendant, notwithstanding you may further believe from the evidence in the case that the order board at Cole Junction was out of repair and the light therein showed white, and that the train dispatcher, the telegraph operator at Cole Junction, and the members of the crew of the other train were also guilty of negligence.

"The term 'negligence,' as here used, means the failure to exercise reasonable care."

Instructions numbered 9, 10 and 11, given at the defendant's request, are as follows:

"9. The court instructs the jury that if they believe from the evidence in the case that the rules of the Missouri Pacific Railway Company in force on June 21, 1903, required plaintiff, before crossing with his train the junction point of the main and river line tracks of the Missouri Pacific Railway, to ascertain that the switch at said junction point was set for the main line, or rather not set against the main line, and that the track at said junction point was unobstructed, and said plaintiff failed or neglected to ascertain either of said facts before crossing said junction point, plaintiff was guilty of negligence; and if you further believe from the evidence that said negligence directly contributed to the collision in which plaintiff was injured, your verdict must be for the defendant.

"10. The court instructs the jury that if you believe from the evidence in the case that the rules of the defendant, in force on June 21, 1903, applicable to

trains approaching the junction point of the main line track and the river line track at Cole Junction, required engineers to approach said junction point with their trains under full control and prepared to stop if the switch at said point was not right and the track at said point was not clear; and if you further believe from the evidence in the case that the plaintiff did not observe and obey said rules, but approached the junction point of said two tracks not prepared to stop and without looking for the switch light at said junction point of said two tracks, and by reason thereof ran into the side of the other train, then he was guilty of negligence and is not entitled to recover in this case, and it is your duty as jurors to return a verdict for the defendant.

"11. The court instructs the jury that it was not only the right, but also the duty, of defendant to make rules for the guidance of its engineers in the operation of its trains, and it was the duty of the plaintiff to observe and obey such rules, and to approach the junction point of the main line track and the river line track at Cole Junction prepared to stop, unless the switch at said point was right and the track at said point was clear; and if you believe from all the evidence in the case that he failed to do so, and that such failure to do so in any way directly contributed to the accident in question, then the plaintiff is not entitled to recover and it is your duty as jurors to return a verdict for the defendant."

The rules introduced in evidence by the defendant and relied upon in connection with other testimony as supplying a basis for the foregoing instructions, including instruction numbered 7 refused, were the following:

(Time-Card Rule): "All trains will approach Cole Junction and the crossover just west of end of double track at Independence under full control.          . . .

"27.    A signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown, must be regarded as a stop signal, and the fact reported to the superintendent.

"98.    Trains must approach the end of double track, junctions, railroad crossings at grade, and draw-bridges, prepared to stop, unless the switches and signals are right, and the track is clear."

It appears from the foregoing that by instruction numbered 7 the defendant sought to present to the jury its contention that it was the duty of the plaintiff to approach the junction "prepared to stop, unless the switches and signals are right, and the track is clear." Instruction numbered 10 was intended to cover the same phase of the defense and in addition the other phase as to the duty of the plaintiff to approach the junction with the train "under full control" as required by the time-card rule. But, as pointed out in the opinion of the court herein, instruction numbered 10 was so worded that it required a finding of negligence under both rules (instead of one) to authorize a verdict for the defendant, while the instruction refused authorized such verdict if the jury found negligence as to the switch lights alone. However, as the theory of the defense contained in instruction numbered 7 separately presented in both numbers 9 and 11, the defendant was not prejudiced by the refusal of number 7. Indeed, instruction numbered 7 was objectionable in form for the reason that no rule required the plaintiff "to watch for the light in the switch stand." It was also clearly objectionable for the reason that in the concluding clause the court assumed as a matter of law the correctness of the defendant's contention that the semaphore light being white did not relieve the plaintiff from contributory negligence, although it was maintained by the plaintiff under his testimony that it did. Instruction numbered 11, while covering the subject of the instruction

refused, was clearly more favorable than defendant was entitled to. It follows from the foregoing observations that in the opinion of the writer prejudicial error was not committed by the refusal of defendant's said instruction.

II.  It was not contended by the defendant, nor is it held by this court, that the plaintiff failed to allege or prove negligence on the part of the company. It was shown by satisfactory testimony that plaintiff was given a train of perishable freight at Pleasant Hill, a point about 120 miles west of Cole Junction, the scene of the wreck, at about five o'clock in the evening, and was directed by a superior officer of the company to make good time in order that his cargo might be upon the St. Louis market the next morning; that on his arrival at the town of Tipton, about thirty-three miles west of said junction, he was handed a written order giving him a "clearance" at Cole Junction, which order authorized him to go through said junction without stopping, if the light in the order board was clear; that when the train came within view of the light in the said order board, about 9 o'clock at night the white light signal was up, meaning a clear track to the next station.  Instead of there being a clear track, an extra train had been ordered from Jefferson City west to Cole Junction and given "the right of track over this train Mr. Finnegan was handling;" that this extra train was upon the track at Cole Junction upon which plaintiff's train was running when the latter approached under clearance orders; that plaintiff was not informed of such extra train by time card, message or signal, and that he had no knowledge of such obstruction on the track until it was disclosed by the headlight of his engine when within one hundred feet. The testimony as to those facts was sufficient to take the plaintiff's case to the jury upon the negligence relied upon in the petition, and need receive but little

further consideration in determining whether there exists warrant of law for the conclusion arrived at in the opinion of this court.

As one of the defenses to the action, the defendant alleged that plaintiff was guilty of negligence in running his train in violation of the rules of the company at the time of the accident; that such negligence contributed to the injury and, therefore, notwithstanding the negligence of the company, bars plaintiff's right to recover. That is the defense which this court has held fatal to plaintiff's case, and the controversy is thus narrowed to the one question: Is the decision of this case upon that issue in harmony with the law? The writer maintains that it is not.

A question of procedure should be referred to before taking up the testimony on the issue of contributory negligence, namely: The rule as to the duty of the court generally to give or refuse an instruction in the nature of a demurrer to the evidence at the close of the testimony, and the application of such rule with reference to the defense of contributory negligence, as in the case in hand.

The law upon this question is so well established that it is unnecessary to insert lengthy quotations from the books. In the case of Mockowik v. Railroad, 196 Mo. l. c. 567, this court, through Lamm, J., discussing the subject of a demurrer to the testimony where contributory negligence was the defense, said: "In determining this question defendant's testimony, where controverted, must be set to one side; because plaintiff in its consideration is entitled not alone to the full force of all uncontroverted facts, but to the full force of all his controverted evidence, and is to be allowed every reasonable and favorable inference of fact deduced from all the evidence and, hence, if there can be two views of his conduct entertained by fair-minded men, one condemning and one exonerating him, he was entitled to the verdict of a jury on his contributory

negligence. If, however, there was but one view to be entertained by reasonable men of his conduct, and that view adverse to him, the question resolves itself into a matter of law.'' In 2 Thompson on Law of Negligence, 1179, the law upon the same subject is stated as follows: ''Where the facts are undisputed, or where but one reasonable inference can be drawn from them, the question is one of law for the court; but where the facts are left by the evidence in dispute, or where fair minds might draw different conclusions from them, it must go to the jury, to resolve the dispute in the one case, or to draw the inference in the other.'' See also Holloway v. Kansas City, 184 Mo. 19; Klockenbrink v. Railroad, 172 Mo. 678; Phelan v. Paving Co., 227 Mo. 666.

Under this rule it is not the province of the court to consider the weight of the testimony, but only its tendency to prove issuable facts, and then only such testimony as is favorable to plaintiff's case. To such an extent does the rule go that even the plaintiff's own testimony may be disregarded, if the testimony of other witnesses entitles him to go to the jury. [Knorpp v. Wagner, 195 Mo. 637; Huff v. Railroad, 213 Mo. 495; 1 Ency. of Evidence, 486] It follows that all such matters as the suggestion that perjury may have been committed at the trial, that a witness for the plaintiff was discharged by the defendant and had a suit pending against it, that a certain fact is proven to the ''entire satisfaction'' of this court, or as to certain testimony against plaintiff, elicited on cross-examination, when such testimony was elsewhere explained or contradicted by other testimony or even by the same witness, are foreign to the duty of the court in determining whether such an instruction should be given. They may well be urged in argument to a jury, but they have no place in this tribunal, upon the issue in hand. Instead of searching out the testimony most favorable to the demurrant and most un-

favorable to the plaintiff, in passing upon the duty of
the court in giving or refusing the demurrer, the rule
requires exactly the opposite.

Coming now to the issue of contributory negli-
gence and the testimony in this case, let us consider
what appears in the record. The defendant, to support
that defense, relied upon certain rules of the com-
pany as to the handling of the train by the engineer,
and contended that the negligent violation of such
rules contributed to and was the proximate cause of
the injury. I do not understand that plaintiff admit-
ted disobedience of the rules and relied upon facts
showing a waiver of their enforcement, as the majority
opinion holds. On the contrary the plaintiff testified,
and was corroborated therein by a number of wit-
nesses, that he complied with the rules as he and others
had interpreted them in his six years' continuous train
service through this station. If, however, the rules
were to be construed as testified to by the defendant's
witnesses, then he contended that such rules, with the
defendant's knowledge, had not been enforced, and
therefore were waived and could not be invoked as a
defense to his action. As to whether the interpreta-
tion of the written rules was a proper subject for the
introduction of testimony, we shall not stop to inquire,
for the reason that the defendant was the first to in-
troduce such testimony and cannot be heard to com-
plain that testimony was also admitted on the same is-
sue on behalf of the plaintiff. But the defendant did
not stop with introducing testimony in support of the
construction of its rules. It submitted such construc-
tion as an issue of fact to be determined by the jury.

Two issues were therefore presented and testi-
mony thereon introduced by each party. These issues
were: (1) did the plaintiff, in running his train, violate
the rules of the company, resulting in the wreck and his
consequent injuries? and (2) if the rules were violated,
had the observance thereof been waived by practice

and usage, with the knowledge of the company that they were not followed in the operation of trains at that point?

Upon the first point the testimony for plaintiff tended to prove that the rule requiring all trains to approach Cole Junction under full control, meant, and had been so construed in the operation of trains, that the engineer should have his train under full control approaching the junction, when and until he came in view of the order board, and that if the light in the order board was red, or if white, and other trains had the right of way over his train from Cole Junction to Jefferson City, the next station, then he should stop before reaching the junction. If, on the other hand, he had been given a clearance order as received by him at Tipton, then, unless the light in the order board was red, it was his duty, and the rules did not forbid it, to "speed up" before reaching the junction, and that in such cases he was not required to continue under full control until he had passed the junction. That the plaintiff was running his train into the junction in accordance with the said rule as thus understood, was testified to by a number of witnesses, including the conductor on the train at the time, and the train dispatcher who had sent the clearance order to Tipton. Plaintiff himself, having been in the service of the defendant for fifteen years and having operated a train through this same junction for six years, testified that he went into the junction that night as he had always done, under similar conditions, during all of that time. The conductor in charge of the train was in the caboose as the train approached and saw the white light in the order board and the speed of the train, and testified at the trial that the train came in sight of the order board at a speed of fifteen to eighteen miles an hour and under full control. Asked how freight trains came into Cole Junction at nighttime, he answered: "Why, they would

come in there under control until they seen how the signal was all right—the signboard. Q. And then what would they do? A. Well, if they had nothing to stop them they would go ahead. Q. In what way did they go ahead? A. Why, go ahead. It means pick up speed." He was further asked what the message received at Tipton indicated as to going through Cole Junction without stopping, and answered: "Well, that indicated that we didn't have to stop there as there were no other trains had any rights over us."

The train dispatcher testified that he told plaintiff his train was a delayed train and "to give them the best he had" or words to that effect. That he meant "that is, make good time; we didn't want any delays; wanted them to run fast, and it was necessary to run fast in order to get that train to St. Louis in time for the morning market." That he was positive he "told" the operator at Tipton that trains 15 and 16 had arrived at Cole Junction, and that it was the duty of the operator to give the order to the conductor of plaintiff's train. That after ordering the extra from Jefferson City west to Cole Junction, an order was given to the operator at the latter point to display the red signal in the order board so as to stop plaintiff's train. That no other trains had rights over plaintiff's train between Cole Junction and Jefferson City. Answering the question as to the course plaintiff should have taken when he arrived at Cole Junction, if he had acted according to the custom, he said: "He would proceed without stopping there, provided the train order board wasn't against him. Q. If the order board shows red, what does that mean? A. It means stop. Q. If it shows white, what does that mean? A. Proceed; clear."

There was abundant testimony tending to prove that plaintiff had his train under full control when he approached the junction and saw the white light on the order board, and that his increase of speed

Finnegan v. Railroad.

thereafter until the collision was not in violation of the rules as understood and followed by plaintiff and other engineers.

There was much testimony introduced by defendant and brought out on cross-examination of plaintiff's witnesses, in conflict with the foregoing. Some of it will be found in the other opinions herein, and the defendant's instructions above set out in this dissent will show the purport of such testimony. This conflict of testimony presented a question of fact to be determined by the jury.

Plaintiff's testimony tended to prove that his duty under the rule requiring him to see that the switches were right and the track clear, etc., was that in coming into a station or junction he was required to see that the switches, which if open would take his train onto a sidetrack, were right, but that when the order board and clearance gave him the right to "speed up" and proceed without stopping, he relied upon that signal as to the switches going out of the junction, which did not lead off from the main track in the direction in which plaintiff's train was going; that there was little danger if such switch was not right, as the train itself would bring it into position. This testimony, being in conflict with that of the defendant as to the interpretation of the rules, presented an issue of fact to be determined by the jury, and this was the theory adopted by the defendant, as is shown by the defendant's testimony and the instructions based thereon, given by the court at defendant's request.

Upon the assumption that the rules were correctly interpreted by the defendant's testimony, there was ample evidence to submit to the jury the issue as to whether a custom and usage was in force showing an abandonment of such rules and that such custom was known to the defendant. There is no lack of tes-

timony tending to prove the existence of the custom and that plaintiff was running his train into the junction that night in accordance with it. The question remains, was there testimony tending to show knowledge thereof by the defendant? The law as to what is sufficient to charge the defendant with knowledge of such a custom and usage was stated by BLACK, J., speaking for this court, in the case of Barry v. Railroad, 98 Mo. l. c. 69, as follows: "But it is further insisted that there is no evidence that the superior officers knew of the existence of such a usage. Knowledge of the usage need not be shown by direct evidence that these officers saw the custom practiced. Notice may be inferred from circumstances. It may be implied from the notoriety of the custom. [Lawson on Usages & Customs, sec. 21.] The evidence in this case tends to show that the usage was well known among the defendant's employees and of long standing, and from this the jury could with propriety infer notice to the defendant's officers."

Was plaintiff's testimony sufficient to take the case to the jury upon the issue of waiver, under the foregoing rule? It was shown that trains had been running for years as plaintiff was running his train that night. Plaintiff had been on that line for six years, operating trains as an engineer under different conductors. They must have known, and the testimony is that the employees generally did know, of such a custom. Even that night the conductor in charge of the train made no objection to the manner in which plaintiff was taking it into the junction, but as a witness gave his approval of plaintiff's conduct. True, his testimony was contradictory and inconsistent, to such an extent as to cause the court to remark in explanation thereof: "He is an employee of the defendant and he doesn't want to lose his job; and he is a friend of the plaintiff and doesn't want to hurt him, is the way it looks to me." But we have no con-

cern with inconsistencies brought out under such pressure on cross-examination, upon the question now under review. That was a matter solely for the jury. A train sheet was offered in evidence showing that the time of every train passing through a register station was made a matter of record. These stations were only a few miles apart, and it is inconceivable that these trains should have been running through Cole Junction at a speed of from fifteen to thirty miles an hour, when compliance with the rules as construed by defendant's witnesses would have limited them to five miles an hour, and the officials of the company have remained in ignorance of such practice. Besides, while so far as the operation of the train is concerned, the conductor is not a vice-principal of the engineer, yet, as to his knowledge of a violation of the rules of the company, adopted for the safety of the lives of the public and of the employees, as well as the care of the property under his control, no good reason can be given why he should not be regarded as a vice-principal and representative of the company. Upon this subject, this court in the case of Tabor v. Railroad, 210 Mo. l. c. 399, quoted with approval from Thompson on Negligence, the following: "The conductor of a railway train is the master of the train, in the same sense in which the captain of a ship at sea is the master of the ship. With respect to those measures which are necessary for the safety of the persons on board the train, he wields the whole power of the railway company, except in so far as those powers have been specially committed to the engineer or to other servants. The better view, therefore, ascribes to him the status and authority of a vice-principal of the railway company, so as to render it liable for his negligence resulting in an injury to its subordinate servants upon the same train." The conductors who had had charge of trains running through this junction, on which plaintiff had served as engi-

neer, must have known that he ran his train at a speed of from fifteen to thirty miles an hour instead of five miles an hour, and if they knew it, it is not an unreasonable presumption that the higher officers of the company also had such knowledge. In any event such facts were competent evidence for the jury in determining whether or not the rules were not enforced, with the knowledge of the company. Under the law applicable in such cases we see no escape from the conclusion that there was testimony from which the jury might have inferred knowledge that the rules governing the running of trains through Cole Junction were not observed, that is, if such rules were to be construed in accordance with the testimony of defendant's witnesses at the trial. If plaintiff's testimony as to their construction is correct, then the rules were not violated and knowledge of the company is immaterial.

In the opinion of this court much stress is laid upon the fact that the time-card rule requiring trains to approach Cole Junction under full control was first promulgated February 8, 1903, less than six months before the wreck, and plaintiff has filed in this court the affidavits of a number of trainmen who had rendered service on that line and were familiar with such rule, to prove that it was in effect long before that date. The point made, based upon the assumed promulgation of that rule, is that as it had been in force so short a time, much of the plaintiff's testimony as to the usage of running through Cole Junction for years preceding the wreck would have no probative force as tending to prove nonenforcement of the time-card rule. The testimony shows that the time card (the "Spring Card" as one witness called it) under which trains were running at that time and upon which this rule was printed, was dated February 8, 1903, but I have searched the record in vain for any testimony that the rule was first promulgated upon

that date. The strong inference is that new time cards were issued from time to time, with the changes made in schedules, for the guidance of the employees; that the same rules as to the running of trains were printed in the new cards as in the old, and that the rule referred to had been in force long before the date of the last time card. But whether the rule was first put in force upon the date of the time card or years before, that fact would not have the effect of changing the issue raised by plaintiff's testimony from an issue of fact for the jury to an issue of law for the court.

Plaintiff had long been in the service of the defendant and, so far as the record discloses, had been a faithful servant. Until the night the operator at Cole Junction made the fatal mistake (whether because of a defective appliance is not important) of placing in the signal board a white light inviting plaintiff to proceed with his train, instead of a red light warning him to stop, no charge of negligence had ever been imputed to him. Indeed, no stronger indorsement of his care and fidelity in the discharge of his duties could be given by the master than the fact that after such a term of service he was placed in a position of such grave responsibility. In my opinion the evidence at least tended to prove that because of the mistake of the operator, and without plaintiff's fault, he was mangled, disfigured and almost blinded for life, and if it did, then plaintiff had the right under the law to have a jury say whether he was entitled to compensation for his injuries, or whether he was responsible for the fearful and fatal wreck.

In my opinion the judgment should be affirmed. *Valliant, C. J.,* concurs; *Woodson, J.,* concurs, except that for reasons stated in a separate opinion he holds the judgment should be reversed and the cause remanded for a new trial.

## DISSENTING OPINION.

WOODSON, J.—I dissent from the majority opinion in this case, for the reasons stated by KENNISH, J., in his dissenting opinion, and I fully concur with the latter opinion.

However, in my opinion, the verdict of the jury and the judgment of the circuit court are grossly excessive, and clearly indicate to my mind passion and prejudice on the part of the triers of the facts; and since the question of liability or nonliability of the appellant was a vital issue in the case, and not admitted, I think the same passion and prejudice of the jury which caused it to assess excessive damages may have and did influence the jury in finding that the appellant was liable on the facts.

Entertaining these views, I am of the opinion that the judgment should be reversed and the cause remanded for a new trial, in order that a fair-minded and impartial jury may pass upon the fact of liability or nonliability of the appellant, as well as the amount of damages sustained by the respondent. [Cook v. Globe Printing Company, 227 Mo. 471, l. c. 562.]

PER CURIAM.—It results from all the opinions filed that this case should be reversed and remanded, and it is so ordered.

## ON MOTION FOR REHEARING.

PER CURIAM.—On motion for rehearing and to modify judgment.

It is suggested that to remand a cause for a new trial because of suggestions made of the existence of facts not fully disclosed in the record is an innovation. But appellant is in error in that contention. In Rutledge v. Railroad, 123 Mo. 121, the judgment was reversed in Division and again in Banc and yet, on mo-

tion to modify, it was reversed and remanded by a full bench because of suggestions in that motion of further pertinent proof on a crucial issue. [p. 140.] A hiatus in the proof likely to be supplied is good reason to remand. [Berning v. Medart, 56 Mo. App. 449-450; Ordelheide v. Railroad, 80 Mo. App. l. c. 369 —separate opinion of Briggs, J.] In Gatewood v. Hart, 58 Mo. l. c. 265, mark the reason given for reversing without remanding, viz.: "The judgment is reversed, *and as it is evident that a new trial will be of no avail to the plaintiffs,* their petition is dismissed, . . ." In Strottman v. Railroad, 228 Mo. 154, the Rutledge case is quoted from [p. 190] and its reasoning approved. Before leaving the Strottman case we refer to the doctrine established thereby to the effect that where all the facts are fully developed on a fair trial on the law, a reversal is *res adjudicata* and plaintiff may sue no more, hence the need of caution in refusing to remand where the facts are left dark by a hiatus in the proof. [*Vide,* Stid v. Railroad, 236 Mo. l. c. 407.]

Moreover, plaintiff had judgment below. Therefore, the laboring oar to reverse outright was with defendant. Now, a majority of the court was not won over to that view. So, while the views of the majority were divergent, yet no case was presented for calling in a special judge, hence the only practical solution was a reversal with a remanding. That course has a precedent, a late case in Banc, Phelan v. Granite Bituminous Paving Co., 227 Mo. l. c. 716.

The motion is overruled.