# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1914.

---

MITCHELL FINNEGAN v. MISSOURI PACIFIC
RAILWAY COMPANY, Appellant.

**In Banc, October 13, 1914.**

1. **NEGLIGENCE: Semaphore: Purpose.** The system of signals
devised to govern the movement of railroad trains, called a
"semaphore," consisting in the daytime of oscillating arms or
blades elevated above station houses, and in the nighttime
of lights displayed therefrom, by which the operator, while
at the electric key, can shift the signals so as to indicate
to the engineer of an approaching train whether the track is
clear or otherwise, was designed to facilitate the movement
of trains by requiring a full stop only when an obstruction
intervenes, or a stop is necessary for the delivery of orders.
Therefore, to accomplish the purpose of a rule declaring that
"all trains will approach Cole Junction under full control"
two things were primarily necessary on the part of the engi-
neer, namely, to bring his train under full control, and to
observe that the signal shone white at night, which white
signal indicated that the track was clear and that he was
not required to stop for orders. The observance of this rule

was paramount to all others; and if the engineer had his train under control and ready to stop until he observed the semaphore showed a white light, and then proceeded, and ran into a train on the track, he was not guilty of negligence; and especially, if in addition to the semaphore notice of a clear track, the initial switch lights were "right."

2. ————: ————: **Switch Lights.** A rule that requires trains to "approach the end of double-track junction points prepared to stop unless the switches and signals are right and the track clear" does not mean that the engineer is not authorized to proceed unless the switch lights at the other end of the tracks, pointing away from the train, are right; that would be to give it an absurd construction. If it means the switch lights located at the approach of the junction and those required by another rule in reference to semaphore signals, and the engineer observed both, and both were right, he was not guilty of negligence in proceeding with his train.

3. ————: ————: **Go Ahead Rear End Signal: Conflicting With Semaphore Rule: Presumption of Observance.** A rule declaring that "no freight train must pass any station or siding at which it is not required to stop, without the enginemen receiving go-ahead signal from rear end," if a requirement in addition to the time card rule authorizing the engineer to proceed when the semaphore signal shone white, was in conflict therewith and may be disregarded; and in the absence of any testimony as to whether or not there was a go-ahead signal, even if the rule is of general application, the presumption is that it was observed.

4. ————: **Rules for Operating Trains: Custom.** A usage or custom on the part of trainmen may be shown to be at variance with or in modification of a printed rule, when the company, through its proper officers, had knowledge of its violation; and that knowledge need not be shown to have been actual, but may be implied from the notoriety of the custom or inferred from the circumstances which of themselves would imply notice. And hence, where the evidence establishes that it had become the custom of engineers to slow down their trains until they observed a white light in the semaphore, and then to proceed, an engineer cannot be charged with negligence for proceeding after he had seen said white-light signal, even though there be rules requiring him to approach the junction under full control, and prepared to stop unless there are rear-end go-ahead signals.

5. ————: **Movement of Trains: Full Control: Evidence of Meaning.** The term "full control" as applied to the movement of a train is technical, and while railroad operatives may well understand its meaning, a jury may not, and hence it is

competent to show by such operatives that it did not mean a full stop of the train; and if the evidence shows that when the freight train was within twelve or fourteen hundred feet of the junction, which the rules required all trains to approach "under full control," the engineer reduced the speed of the train to twelve or fifteen miles an hour, which would have enabled him to come to a full stop in six or seven hundred feet, and then seeing that the initial switch lights were "right" and that the semaphore light showed white, which was a signal that the track was clear, he increased his speed, it is competent for the court to instruct the jury that, if they find this evidence to be true, the rule as to "full control" was complied with.

6. ———: ———: **Expert Testimony: Hauling Train in Usual and Proper Manner.** The usual and ordinary manner of operating railroad trains is a subject of expert evidence. It is proper to permit the train dispatcher, who had charge of the movement of trains on the division on which one freight train collided with another, and knew the significance of train orders, signals and switch lights, to testify as to the purpose and meaning of signals, switch lights, dispatches sent and delivered, and the usual and customary manner of running trains at the point of the accident, for the purpose of enabling the court or jury to fully understand the facts in the given case, in order that the appropriate rules of law may be applied thereto.

7. ———: **Instruction: Trains: Meaning of Orders.** The words "orders" and "rules" as applied to the movement of trains are synonymous, and there is no difference in their practical application. An instruction telling the jury that "the orders to the engineer and signals displayed authorized him," etc., is justified by the evidence, if the rules of the company, or their substituted custom, familiar to every operative, authorized the instruction, for such rules and custom had the practical force and effect of an order.

8. ———: **Rules on Time Card: Judicial Notice.** The court will take judicial notice, if the fact does not appear in evidence, that all train operatives carry the current time card of trains, and that the rules printed thereon are ever present with the engineer of a freight train.

9. ———: **Freight Trains: Ruling Signals: Observance and Abandonment.** The ruling signals by which an engineer of a freight train was to be guided in approaching a junction, under a wholesome and common-sense interpretation of the company's rules in this case, are *held* to have been the initial switch lights and the light displayed in the semaphore; and whether or not those paramount rules, and others read in connection

therewith, were observed, either by a compliance with their terms or in such a manner as to work their abandonment or abrogation, was a matter for the jury, since there was evidence upon which either theory might have been based.

10. **VERDICT: Evidence of Prior Efficiency.** The material issue being the plaintiff's injury, and not his past record, evidence of his efficiency and fidelity throughout a long term of service does not, as a general proposition, help to fix the amount of damages; but where a case presents a flawless trial record, convincing proof of plaintiff's injuries and an absence of evidence of negligence, suuh evidence is not improper, as supplemental to the main facts; for, it gives moral effect and evidential force to said other facts and thereby assists in determining the amount of damages which should be awarded for the injuries sustained.

11. ————: **Excessive: $25,000.** Plaintiff, an experienced engineer, thirty-seven years of age, in good health, ran his freight train, without negligence, into another train standing partly on the main track and partly upon the track of a branch road; he was earning $175 per month, and for eighteen consecutive years he had been in the employ of defendant, half the time as a locomotive engineer, and not a single mark of delinquency mars his record of faithful service; he possessed at all times a cool head, a steady hand and a devotion to a hazardous duty scarcely equalled in the industrial world; as a result of the collision he was rendered unconscious, and covered with muriatic acid, which burned him from the elbows to the finger tips, and from the breast bone to the top of the head; one ear was nearly burned off, his eyes were severely burned, and the ligaments attaching the right pelvic bone to the spine were torn loose, and as a result there has been a distortion or displacement of the entire pelvis; there was curvature of the spine, and the pelvic bone has shifted two and a half inches out of its normal place; one leg is an inch shorter than the other; a scar tissue has formed over his eyes, as a result of the acid burns, destroying the vision of one, save as to perception of light, and lessening the visual power of the other to the extent of nine-tenths of that of a normal eye; and he is now unable to pursue any gainful avocation. The jury returned a verdict for $50,000, and, upon a motion for a new trial, the trial court required a *remittitur* of $25,000, and that being filed overruled the motion.

    *Held*, by WALKER, BROWN and BOND, JJ., that the judgment for $25,000 is not excessive. *Held*, by LAMM, C. J., that it is excessive, and that it should be reduced to $15,000 and then affirmed. BROWN, J., concurs in affirmance, and recalls what was said by him upon the former

appeal, since what he then said was based upon a misunderstanding of the facts.

*Held*, by WOODSON, J., that the verdict for $50,000 shows passion and prejudice on the part of the jury; and there being evidence of plaintiff's contributory negligence, that prejudice attaches to the entire verdict, and in consequence the rules for a fair trial require a reversal.

*Held*, by GRAVES, J., with whom FARIS, J., concurs, that for the reasons stated in the opinion of BROWN, J., 244 Mo. 643, and in his own opinion, 244 Mo. 616, on the former appeal, the judgment should be reversed, since the record does not show such a change in the facts as to destroy the legal conclusions there reached.

*Held*, upon *per curiam*, that the parties having, since the opinion was written, filed a stipulation agreeing to a judgment for $10,000, the judgment is affirmed for that amount.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

AFFIRMED (*as per stipulation*).

*Martin L. Clardy* and *Edw. J. White* for appellant.

(1) The trial court should have directed a verdict for the defendant. (a) The plaintiff was guilty of violating every positive and distinct rule of the company, the observance of any one of which would have prevented the accident. He was perfectly familiar with the rules; admitted that they were all in effect at the date of the collision, and he knew that they were adopted for greater safety in the operation of trains, and his wilful failure to obey them caused the loss of life of his head brakeman and fireman, and constituted gross negligence on his part, and he should not be rewarded for the disastrous consequences of his own wrongful act. Finnegan v. Railroad, 244 Mo. 608; Schaub v. Railroad, 106 Mo. 92; Francis v. Railroad, 110 Mo. 395, 127 Mo. 658; Reagan v. Railroad, 93 Mo. 348; Brooks v. Railroad, 47 Fed. 687; Railroad v. Nickels, 50 Fed. 718; Railroad v. Dye, 70 Fed. 24; Rail-

road v. Craig, 80 Fed. 488; Railroad v. Markee, 103 Ala. 160; Railroad v. Williamson, 114 Ala. 131; Railroad v. Free, 97 Ala. 231; Pryor v. Railroad, 90 Ala. 32; Railroad v. Hammond, 58 Ark. 324; Sloan v. Railroad, 86 Ga. 15; Fordyce v. Briney, 58 Ark. 206; Railroad v. Kitchens, 83 Ga. 83; Railroad v. Mapp, 80 Ga. 631; Railroad v. Bragonier, 119 Ill. 51; Abend v. Railroad, 111 Ill. 202; Railroad v. Kastner, 80 Ill. App. 670; Railroad v. Kerwick, 74 Ill. App. 670; Matchett v. Railroad, 132 Ind. 334; Railroad v. Utz, 133 Ind. 579; Railroad v. Lang, 118 Ind. 579; Sedgwick v. Railroad, 76 Iowa, 340; Thoman v. Railroad, 92 Iowa, 196; McAunich v. Railroad, 20 Iowa, 338; Gorman v. Railroad, 78 Iowa, 509; Railroad v. Kier, 41 Kan. 661; Alexander v. Railroad, 83 Ky. 589; Herman v. Railroad, 11 La. Ann. 5; Gordy v. Railroad, 75 Md. 297; Foss v. Railroad, 170 Mass. 168; Benage v. Railroad, 102 Mich. 72; Karrer v. Railroad, 76 Mich. 400; Lyon v. Railroad, 31 Mich. 429; White v. Railroad, 72 Mich. 12; Railroad v. Rush, 71 Miss. 987; Gorham v. Railroad, 113 Mo. 408; Zumwalt v. Railroad, 35 Mo. App. 661; Towner v. Railroad, 52 Mo. App. 648; La Croy v. Railroad, 132 N. Y. 570; Shields v. Railroad, 133 N. Y. 557; Mason v. Railroad, 114 N. C. 718; Bennett v. Railroad, 2 N. D. 112; Wolsey v. Railroad, 33 Ohio St. 227; Cypher v. Railroad, 149 Pa. St. 359; Railroad v. Wilson, 88 Tenn. 316; Railroad v. Smith, 89 Tenn. 114; Murry v. Railroad, 73 Tex. 2; Railroad v. Gray, 65 Tex. 32; Railroad v. Wallace, 76 Tex. 636; Railroad v. Lucado, 86 Va. 288; Darracott v. Railroad, 83 Va. 288; Robinson v. Railroad, 40 W. Va. 583; Eastburn v. Railroad, 34 W. Va. 681.    (b) The conduct of the plaintiff was such criminally negligent conduct, inconsistent with the safety of the lives and limbs of the citizens of the State—two of whom lost their lives as a result thereof—that such wanton conduct could not be justified by any custom or practice of the defendant's employees, because such conduct would amount in law

to criminal carelessness, constituting in the instant case the crime of manslaughter. Custom can never furnish authority for the doing of a grossly negligent act. Concurring opinion Justice Brown, Finnegan v. Railroad, 244 Mo. 647; 26 Cyc. 1273; McDermott v. Railroad, 87 Mo. 295; Whaley v. Coleman, 113 Mo. App. 599; Keegan v. Kavanaugh, 62 Mo. 232; Shartell v. St. Joe, 104 Mo. 120; Penney v. Stock Yards Co., 212 Mo. 328; U. P. R. Co. v. Brady, 161 Fed. 722; Gilbert v. Railroad, 128 Fed. 529; Zentz v. Chappell, 103 Mo. App. 208. (2) The court erred in admitting illegal and improper evidence on the part of plaintiff. The court committed error in permitting the plaintiff's witnesses to testify what the plaintiff's duty was when approaching Cole Junction, as this usurped the province of the jury, as the rules prescribed his duty and the rules were the best evidence. (a) The opinion of witness Hoffman to the effect that the plaintiff handled his train at Cole Junction in the proper and usual manner, was a mere conclusion of the witness in direct violation of the defendant's rules. (b) The plaintiff's testimony about the message that trains 15 and 16 had left, and also his conclusion about what the switch lights at Cole Junction meant at night, were his mere conclusions as to ordinary language, which the jury could understand, as well as the plaintiff and it was incompetent. (c) The plaintiff's statement that the way he came into Cole Junction was the usual and customary way of running into Cole Junction, was a mere conclusion of the witness. (d) The plaintiff's testimony about who usually threw the switches there for the river route was incompetent. (e) The blank register slip, defendant's form 319, providing that operators should have the same confirmed by the train dispatcher, as to correctness, before entering on the train register, for the reason that no such register slip was used by the plaintiff's train at the time of his injury, and such blank register slip was incompetent

for any purpose. (f) The conclusions and opinions of the plaintiff's witness, the restaurant-keeper, McGinn, that at the time in question plaintiff's conduct in running into the freight train on the river track was a compliance with the time card and the defendant's rule No. 98, as this was the very issue the jury were called upon to decide, and the witness's opinion was in the teeth of the majority opinion of this court when the case was here before. 1 Wigmore on Evidence, sec. 97. The mere declaration of witnesses as to their opinion of a course of dealing, and the existence of a custom, is not evidence of the obligations resting upon them. Cotton Press Co. v. Stanard, 44 Mo. 71; Percell v. Railroad, 126 Mo. App. 43. (3) The court erred in giving illegal and improper instructions at the request of the plaintiff, over the defendant's objections and exceptions. (a) The plaintiff's first instruction submitted the case to the jury upon the plaintiff's right to proceed at Cole Junction because of the "orders to plaintiff and the signals displayed," as authority for him to proceed as he was, when no "orders" to proceed in such a manner were introduced in evidence at all, and all of the testimony showed that the switch signals, which amounted to a stop signal, were not "displayed," because of the freight train on the river route between the plaintiff and the switch lights, at the time of the collision, and the order board, under the circumstances, was not a "signal displayed," which would authorize the violation of the defendant's rules, and the conclusion that the plaintiff was exercising "ordinary care," at the time of running into the defendant's freight train on the river division was in direct violation of the opinion of this court in this case. Finnegan v. Railroad, 244 Mo. 608. (b) The court erred in giving the plaintiff's second instruction, because in this instruction the court told the jury that while the plaintiff would be barred of recovery if his injuries were contributed to by any violation of the

defendant's rules, "in force at said time and which had not been abrogated or abandoned by defendant, still if you further believe and find from the evidence that at and before the time of the plaintiff's injuries it was the custom and usage among engineers of the defendant to disregard the rule or rules at the point in question, and that the defendant's superior officers and representatives in charge and control of said engineers knew of and acquiesced in said custom and usage, then said rule or rules would be abrogated at said point," as such rules could not be lawfully abandoned, and if they could there was no testimony to base any abrogation or abandonment of the defendant's rules upon, nor a scintilla of evidence that any of the defendant's officers or agents acquiesced in any custom at variance with the duties and proper enforcement of said rules. (4) The damages assessed by the jury, after the *remittitur* by the trial court, are grossly excessive. Finnegan v. Railroad, 244 Mo. 608; Dutcher v. Railroad, 241 Mo. 177; Partello v. Railroad, 217 Mo. 645; Lessenden v. Railroad, 238 Mo. 247; Cook v. Railroad, 94 Mo. App. 417; Chitty v. Railroad, 166 Mo. 435; Whalen v. Railroad, 60 Mo. 323.

*Walsh, Aylward & Lee* and *E. R. Morrison* for respondent.

(1) Under the former decision in this case the present judgment should be affirmed. Finnegan v. Railroad, 244 Mo. 608. (2) (a) Plaintiff ran his train according to the customs and according to the rules as interpreted by him. If the rules should be interpreted otherwise, then they had been abrogated. Barry v. Railroad, 98 Mo. 62; Lowe v. Railroad, 89 Iowa, 427; 20 Am. & Eng. Ency. Law, 109; Railroad v. Caraway, 77 Ark. 105; Haynes v. Railroad, 143 N. C. 154, 9 L. R. A. (N. S.) 972. (b) Whether the switch light at the junction point was a ruling signal as ap-

plied to plaintiff's train was a question of fact for the jury.   (c)  The testimony at the present trial was stronger than at the previous trial and the language of KENNISH, J., in his opinion upon the former appeal is applicable here.   Finnegan v. Railroad, 244 Mo. 660. (d)  Plaintiff's case is strengthened by the definition of "full control" given at the request of the defendant.   (e)  The evidence shows that plaintiff complied with the rule as construed by him and his witnesses. Railroad v. Mortensen, 27 Tex. Civ. App. 106; Hall v. Railroad, 46 Minn. 439; Penn Co. v. Roney, 89 Ind. 453; Railroad v. Parker, 131 Ill. 557; Maehren v. Railroad, 98 Minn. 375; Yongue v. Railroad, 133 Mo. App. 141; Hunn v. Railroad, 78 Mich. 526, 7 L. R. A. 500. (f) The rules must be construed with reference to the particular conditions existing at Cole Junction.   (3) There was no error in plaintiff's instructions.   Carter v. Exposition Co., 124 Mo. App. 538; Holland v. McCarty, 24 Mo. App. 112; Feary v. O'Neill, 149 Mo. 474.   (4)  There was no error in admission of testimony.   Brunke v. Tel. Co., 115 Mo. App. 39; Ridenour v. Mines Co., 164 Mo. App. 592.   (5)  The judgment is not excessive.   Gordon v. Railroad, 222 Mo. 516; Corby v. Telephone Co., 231 Mo. 417; Markey v. Railroad, 185 Mo. 348; Yost v. Railroad, 245 Mo. 252; Clark v. Railroad, 234 Mo. 396; Waldhier v. Railroad, 87 Mo. 37; Burho v. Railroad, 140 N. W. 300; Railroad v. Brogan, 151 S. W. (Ark.)  699; Hackett v. Railroad, 170 Ill. App. 140; Perkins v. Sunset T. & T. Co., 155 Cal. 712; Zibbell v. Railroad, 116 Pac. (Cal. 1911) 513; Railroad v. Webster, 137 S. W. (Ark. 1911) 1103; John v. Railroad, 111 Pac. 632; Railroad v. Matkin, 142 S. W. (Tex. Civ. App. 1911) 604; Railroad v. Gray, 137 S. W. (Tex. Civ. App. 1911) 729; Huggins v. Railroad, 79 S. E. (S. C. 1913) 406; Jenkins v. Railroad, 145 N. W. (Minn. 1913) 40; Railroad v. Shelton, 69 S. W. (Tex. Civ. App. 1902) 653; Haggard v. Refining Co., 132 Iowa, 724; Whitehead v. Railroad, 114

N. W. (Minn. 1907) 254; Snell v. Oil Co., 106 S. W. (Tex. Civ. App. 1907) 170; Railroad v. Wallace, 91 Miss. 492; Retan v. Railroad, 94 Mich. 146; Railroad v. Friedman, 41 Ill. App. 270; Smith v. Whittier, 95 Cal. 279; Railroad v. Dalton, 120 S. W. (Tex. Civ. App.) 240; Railroad v. Connoley, 77 Neb. 254 (1906); Olson v. Gill Home Inv. Co., 108 Pac. (Wash.) 140; Hall v. Railroad, 46 Minn. 439; Railroad v. Vanlandingham, 39 Tex. Civ. App. 206. And the fact that the judgment as it now stands is the same as the first verdict warrants affirmance. Lokar v. Elec. Ry. Co., 94 Mo. App. 485; Shohoney v. Railroad, 231 Mo. 141; Partello v. Railroad, 240 Mo. 142.

WALKER, J.—Action for personal injuries. Second appeal.

On the first trial a verdict was rendered in plaintiff's favor for $25,000, which upon a review by this court was reversed and remanded. [244 Mo. 608.] Upon a second trial a verdict was rendered in plaintiff's favor for $50,000, which was reduced by the trial court to $25,000, and a judgment of *remittitur* entered in accordance therewith, from which judgment defendant appeals to this court.

For eighteen years prior to and including June 21, 1903, the date of plaintiff's injuries, he was employed by defendant in different capacities connected with its train service and for nine years of that time was a locomotive engineer on the division of defendant's railroad between Pleasant Hill and Jefferson City. On the night plaintiff was injured he was running an engine pulling an eastbound freight train consisting of twenty-four cars, twenty-one of which were loaded with live stock, three with dead freight, one of which was muriatic acid, and a caboose. The accident, which resulted in plaintiff's injuries, occurred at Cole Junction, four miles west of Jefferson City; at this point the river route of the defendant's road diverges from

the main line and runs westwardly to Kansas City. Between the Junction and Jefferson City the main line and river route trains use a common track. At Tipton, thirty-four miles west of Cole Junction, plaintiff while *en route,* the night of the accident, received a message from the train dispatcher that certain passenger trains, which, under· the rules, had the right of way over plaintiff's train between Jefferson City and the Junction, had reached the latter point; without further notice this gave plaintiff to understand that from the Junction to Jefferson City the road was open for his train.

At the Junction there was a telegraph station, and an operator in charge, whose duty it was to make what railroad men call a "block," by displaying a red light on the semaphore for ten minutes after · the arrival and departure of trains from said station; he was also required to open the switch for all west-bound trains running from the main line over the river route, and to close the switch after the passage of all trains; at night he was required to display a red signal upon receipt of orders of an approaching train, and when a train was using the switch to block the main line.

On the night in question, after plaintiff had received his usual orders for the running of the train, and the message at Tipton, the train dispatcher permitted an extra freight train, or one not on the time card, to be run from Jefferson City to Cole Junction. No notice was given plaintiff of the running of this train at either of the telegraph stations he passed after it was ordered out from Jefferson City, and upon his arrival at the Junction no red light on the semaphore notified him of its being there. Under the rules, and as a necessary precaution, he should have been given this notice. The night was dark and a drizzling rain was falling; the plaintiff's engine had an oil headlight, which did not penetrate the darkness more than one hundred feet ahead. When he came around the curve

at Cole Junction the light of the semaphore showed white, and he proceeded on his course.    The extra freight was about half on the main line and half on the river route, and plaintiff ran into it, with the result that the fireman and head brakeman were killed and plaintiff was injured.    At the time this occurred there' was a rule in the defendant's time cards that "all trains will approach Cole Junction and the cross-over just west of the end of the double track at Independence under full control."    So far as Cole Junction is concerned, this rule had been in' force for more than two years before the accident and plaintiff was familiar with same.    The reasonable and proper construction of this rule, according to the plaintiff's testimony, is that he was to approach the Junction with his train under sufficient control to stop same if the order board or red light on the semaphore indicated that the track was not clear, but if the semaphore showed a white light he was authorized to proceed; that on the night in question the message received by him at Tipton informed him that the track was clear for his train from the Junction to Jefferson City, and that this information was confirmed when within fifteen hundred feet of the Junction he saw a white light on the semaphore; that just before this, in compliance with the rule when he reached the whistling post, "he whistled, shut off the steam, let the train drift and set the air brakes a bit until within a quarter of a mile of the board or semaphore, when his speed was not more than twelve or fifteen miles an hour.    Upon seeing the white light on the semaphore he released the brakes, let the train drift until within six hundred or seven hundred feet of the board or semaphore, which still showed a white light, when he increased the speed, and noticed nothing unusual until his headlight disclosed a box car across the track, when he shut off the steam and set the brakes, but too late to avoid the collision.''

The usual manner of going into Cole Junction, under the rule, was to reduce the speed of the train so that it could be stopped if the order board or semaphore showed a red light, indicating that the track was not clear; if a white light was shown it said, in the dramatic language of counsel for plaintiff, "Come on, come on," and the engineer was safe in proceeding through the station at a speed of from eighteen to twenty-five miles per hour. This custom of approaching the Junction had been in vogue ever since the river route was opened.

The headlight on the engine of the extra train was not visible to one on an engine coming eastwardly on the main line, on account of the headlight of the extra train being obscured by a bluff; the same bluff at the lower end of the train hid the lights on the caboose. Plaintiff, therefore, could see nothing of the obstructing train until it was disclosed by his headlight.

Defendant contends, regardless of the condition and office of the light on the semaphore, that plaintiff should have observed the switch lights at the east end of the yards as he approached the Junction, and have governed his train accordingly. This contention is based on defendant's rule 98, which provides that, "Trains must approach the end of double-track junction points, railroad crossings at grade, and drawbridges, prepared to stop unless the switches and signals are right and the track is clear." Other rules, which it is claimed plaintiff violated, are also invoked as follows:

"27. The absence of a signal at a place where a signal is usually shown must be regarded as a stop signal.

"106. In all cases of doubt or uncertainty, the safe course must be taken and no risks run.

"108. No freight or work train must pass any station or siding at which it is not required to stop,

without the enginemen receiving go-ahead signal from rear end."

The testimony of witnesses, many of them present at the time of the collision, and all practical railroad men, is probably the best test as to plaintiff's duty in determining whether he was authorized to pass the Junction upon observing a white signal on the semaphore, regardless of the switch lights.

Norman Crawford, the conductor of plaintiff's train, says: "At Tipton I received a message giving my train the right of way at Cole Junction. We were required to approach the Junction under full control until we saw the board was clear. This the engineer did. I saw the board; it showed a white light. The engineer could have stopped the train had it been necessary, if the light had shown red. I received no orders in regard to the extra freight train with which we collided."

G. E. Goodwin, brakeman on plaintiff's train, was on top of the caboose when they approached the Junction; saw the semaphore; it showed white; the train was under such control it could have been stopped in time if signal had been red. Train was running twelve or fifteen miles an hour as they approached the Junction station. The engineer then increased the speed, and was running at twenty miles an hour when they passed the station.

George L. Shemwell, head brakeman on plaintiff's train, was in the cupola of the caboose before the collision, and saw the light on the semaphore at from three hundred to five hundred feet distant; it showed white. A mile or so before they reached the Junction the engineer began to slow down, and when they reached the curve just west of the station he was running at the rate of twelve or fifteen miles an hour, and ran at this speed for six or seven hundred feet; he then released the air and started up, and at the time of the collision was running at the rate of eighteen or

twenty miles an hour.  Witness had noticed a number of trains running through the station; they would reduce their speed until they could see that the board was clear, when, if the light showed white, they would release the air and increase their speed.  After the accident he got down out of the caboose, and again examined the light and it still showed white.  When he started back to flag, he looked at the board again about ten yards distant, and it still showed clear.  Trains are operated at night as in the daytime.  He had noticed them run through at night at a speed of thirty or thirty-five miles per hour.

T. G. Morris, day operator at the Junction at the time of the collision, said:  ''A semaphore signal is regulated by blades by day and by lights at night.  On one end of the blade there is a red lens, and when the lever is released it draws the lens up in front of the light and shows red.  When the lever is pulled down the light shows white.  Trains approaching the Junction from the west cannot see the signal at all until from twelve hundred to fifteen hundred feet therefrom.  No trains had a right over plaintiff's train the night of the collision, between Jefferson City and the Junction, after the two trains had arrived at the latter point, of which plaintiff had notice at Tipton.  Trains having the right of way would not stop at Cole Junction to register unless the danger signal or red light was shown.  By the term 'full control' is meant that a train should approach a station prepared to stop if a danger signal is given, and at Cole Junction the danger signal is given by displaying it on the board or semaphore above the office.''

Bob Brunt, a brakeman on a river route train, said:  ''Our train was headed up almost at right angles to the main line.  When trains rounded the curve and saw the order board was clear, they would go ahead with increased speed because it was not neces-

sary to continue down to the office at a reduced speed, if there were no orders for the train."

Fred Hamrick, employed formerly by defendant as fireman, then as engineer from 1901 to 1905, was familiar with the manner in which eastbound freight trains were run through Cole Junction at the time of the collision. A registry was provided for the conductor to throw off when he had a clearance card; it was customary for the engineer to run down until he could see the board, when, if it was red, he should have his train under such control that he could stop. It was customary to increase the speed if the light showed white; this custom was in force and prevailed generally prior and until June 21, 1903, from his personal knowledge.

F. A. McGinn testified that he had been employed as brakeman and conductor by defendant for seventeen years, up to April, 1903, and had run over the line in question during that time; that it did not require any particular speed in passing the Junction; that a white light on the semaphore indicated safety and clearance, giving the right to the main track, and to keep going. Clearance was given by the operator at Cole Junction to engineers. If an engineer approached the Junction and saw that the semaphore light was white, he then had the right to proceed and increase his speed; that this was the custom on and prior to June, 1903, and had been the custom during witness's employment. The switch light at the junction point where the switch point was toward the east would have nothing to do with the operation of eastbound trains.

Plaintiff's own testimony in this regard was that the engineer did not have to look out for any switch lights except ruling switch lights, ruling switch lights meaning those at the end of the yard where the train is coming in; that coming into Cole Junction plaintiff looked for a switch light at the west end of the yard,

261Mo32

but did not look for a switch light at the junction point, for the reason that the point of the switch there was towards the east; that the switch light at that end would make no difference. It was not customary for the engineer to pay any attention to the switch lights or regulate the running of his train on account of his inability to see them when the switch points were directed away from him as he approached the Junction. It was the operator's duty to show a red light on the semaphore for ten minutes after any river route train had entered the main line, to make a ten-minute block.

W. W. Hoffman, a train dispatcher at Jefferson City for defendant for fifteen years, testified that plaintiff on the day of the accident was running a stock train that had been delayed; that he (witness) wired plaintiff to make good time in order to reach St. Louis for the morning market; that he also wired plaintiff at Tipton that the track was clear of any trains which had the right of way between Jefferson City and Cole Junction over plaintiff's train. Under the custom, plaintiff was not required to stop at Cole Junction unless the order board was against him, but his conductor would throw off a register ticket. This custom had been in force ever since the river route had been in operation. Witness gave the order for the extra train at Jefferson City, the purpose being to give it the right of way between Jefferson City and the Junction over plaintiff's train, and sent an order to this effect to the operator at Cole Junction, whose duty it was, upon receipt of same, to turn the order board red; this order was sent to the Junction thirty or thirty-five minutes before plaintiff's train reached that point. This extra freight train had no class, and in the absence of orders received by plaintiff his train had the right of way over it.

J. F. Fletcher, a section hand, living at the section house just west of the signal board at Cole Junction, was in bed when he heard the noise of the colli-

sion. He jumped up, looked at the semaphore, and saw that it showed a white light. During the month preceding the accident he had frequently seen trains come around the curve from the west, on the main line, check their speed until they could see the signal light, and if it showed clear then increase their speed and go through at twenty miles an hour.

So much for the testimony of witnesses detailing the custom prevailing under the rules relative to trains approaching a junction such as that where the accident occurred. Opposed to the construction placed upon the rules by these witnesses, defendant introduced five or six of its employees who testified to the contrary that it was necessary that an engineer approaching a junction should observe the color of the switch lights, as well as the order board, before passing the station.

As a result of the collision plaintiff was rendered unconscious for probably half an hour. When he regained consciousness he was lying near the track, covered with mud and muriatic acid. The acid had burned him from the elbows to the finger tips; and from the breast bone to the top of his head, one ear being nearly burned off. Upon being taken to the hospital and examined, it was found that his eyes were severely burned, and that the ligaments attaching his right pelvic bone to the spine had been torn loose. For six weeks thereafter he suffered constant pain. He was in the hospital on account of these injuries more than ten months. His disability is permanent. The character of his injuries is graphically described in the composite testimony of four or five medical experts who testified in the case after having examined him at different times. It is as follows: An X-ray examination showed a distortion or displacement of the entire pelvis. There was curvature of the spine, the right pelvic bone was shifted two and a half inches to the right; the adjacent muscles and tendons were thrown

out of equilibrium on account of having been wrenched from their adhesions and from not having normally united; and there was a limited action of the left leg, which was an inch shorter than the other. Plaintiff was in a nervous condition due to injuries to the spinal cord. As a result of burns by the acid, a scar tissue had formed over his eyes, destroying the vision of one, save as to the perception of light, and materially lessening the visual power of the other to the extent of nine-tenths of that of a normal eye. At the time of the injury plaintiff was thirty-seven years of age, in sound health and earning $175 per month as a railway engineer. He is now unable to efficiently pursue any gainful calling.

We have set forth the material testimony to which the jury gave credence, their finding in the presence of evidence pro and con being final. We find upon comparison a marked difference between the testimony introduced at the trial of the instant case and that at the former hearing.

I. We are confronted at the threshold of defendant's testimony with an array of rules, **Rules for Operating Railroad Trains.** the alleged violation of which, it is claimed, will preclude plaintiff's recovery. A review of same becomes, therefore, not only pertinent but necessary.

On the time card in effect at the time of the collision in which plaintiff was injured, there appeared, and had appeared on former time-cards, the following rule which we copy so far as it has reference to the Junction, to-wit: "All trains will approach Cole Junction . . . under full control." In addition there were rules numbered respectively 27, 98, 106 and 108, which we have set out in the statement of facts, and will now discuss in connection with the rule on the time card, which had appeared thereon for more than two years before the accident in which plaintiff was

injured, or from the time the river route had been opened. The rule in regard to approaching the Junction under full control is the one upon which the principal defense is based, and the others may properly be regarded as subordinate thereto. Analysis will demonstrate the correctness of this conclusion. It is evident that the purpose of the principal rule, as with the great majority of rules adopted by railroad companies, was to facilitate business and to minimize or, if possible, eliminate accidents in the operation of trains; and certainly nothing could be more conducive to this end than the requirement that trains approach junction points in such a manner as not to be required in each instance to stop, but to enable them to readily be brought to a full stop if necessity required. Average human experience in these days of expedition authorizes us to take notice of the fact that the dispatch with which the business of railroads is conducted does not admit of trains coming to a full stop at junction points until in each instance it be determined if the track is clear, but in the evolution of rapid transit a system of signals has been devised and generally installed, especially on trunk lines, consisting in the day time of oscillating arms or blades elevated above the stations, which in the night time are provided with lights. This is also called a semaphore system, and through its agency an operator is enabled, while at his key, to shift the signal so as to indicate to the engineer of an approaching train whether the track is clear or otherwise. This system makes the operator, as it was evidently intended he should be, master of the situation at his particular station; and it facilitates the movement of trains by requiring a full stop only when an obstruction intervenes, or it is necessary for the delivery of orders. To accomplish the purposes of this rule two things were primarily necessary on the part of the engineer: One to bring his train under full control, and the other to observe the signal which, if at night, as

in the instant case, shone white, indicated that the track was clear and that he was not required to stop for orders. If this is not the correct construction of this rule, and, in connection with the semaphore signals, its observance is not paramount to all other regulations, then its purpose is defeated and its adoption was an empty formality. The witnesses, all experienced railroad men, whose testimony was given determining credence by the jury, gave the rule the construction stated. In our opinion none other can be given to it without not only destroying the purpose of its adoption, but subjecting an engineer to the consideration, at each junction point, of a maze of rules, the attempted observance of which would only tend to confuse, a consummation not to be desired in the operation of trains freighted with human life or charged with the safe transportation of property.

Rule 27 can have no application here because the signal was shown at the place where same was required to be. Rule 98 was not violated because plaintiff's train in approaching the junction point found the switches right, if they are to be considered as well as the signal. The contention that in approaching a junction point and finding the switches and signals right, the engineer is nevertheless not authorized to proceed unless the switch lights at the other end of the tracks, pointing away from the train, are also right, is, to our mind, absurd, and witnesses who testified to the general application and binding force of this requirement in addition to the observation of the semaphore signal, were not believed by the jury. Rule 98 may, however, be so construed to be in harmony with the time card rule; this will limit the switches or switch lights to be observed by the engineer to those located at the approach to the junction, and not to those located beyond same. If this is not its correct interpretation, then the words, "Trains must approach the end of double-track junction points . . . prepared

to stop unless the switches and signals are right and the track is clear," do not mean what they clearly express, namely, that as the train approaches the junction the engineer must note, first, that the switches are right, second, that the signal is right, and, third, that the track is clear. If it was not intended that the rule was to be observed in the order in which the requirements are stated, and that is the manner in which, under either the rules of common sense or interpretation, it should be construed, why did it not require in addition that the switches, at the point where trains leave a junction, should also be observed by engineers before proceeding on their way? It did not, however, and if it had it would have destroyed the purpose of the signal standing aloft over the station, an arm by day and a flaming light by night, subject to the will and hand of the operator which told the engineer, in a language he could not misunderstand, what he was authorized to do. Rule 106 is precautionary and as the facts here show no negligence it has no application. Rule 108, if it be construed as an additional requirement to the time card rule, is in conflict therewith and may be disregarded. So far as we find from the record there was no go-ahead signal from the rear in this instance, and, in our opinion, none was required. In the absence of any direct testimony on this point, however, we are, if the rule is of general application as contended by appellant, justified in the presumption that it was observed in this instance; if not, defendant has no just ground of complaint.

From all of the foregoing we are of the opinion that plaintiff was running his train in conformity with the paramount rule supplemented by observance of the initial switch light and the semaphore signal. This was the construction placed upon the rule by plaintiff and other train operatives, and it had prevailed uninterruptedly for such a length of time that in the absence of the express rule it could under well estab-

lished principles of law be regarded as a controlling custom or usage. A usage or custom on the part of employees of defendant may be shown to be at variance with or in modification of a rule when defendant has, through its proper officers, knowledge of such violation; nor need it appear that the officers of defendant charged with the enforcement of the rule had actual knowledge of the usage or custom; such knowledge may be implied from the notoriety of the custom or inferred from circumstances whereby they are charged with notice. [Yost v. Railroad, 245 Mo. l. c. 246; Shimp v. Stove Co., 173 Mo. App. l. c. 433; Lowe v. Railroad, 89 Iowa, l. c. 427; Haynes v. Railroad, 143 N. C. 154, 9 L. R. A. (N. S.) 972.]

If, therefore, the construction placed on the rule by the plaintiff and other operatives was the correct one, then he was not guilty of negligence; on the other hand, if the rule was violated as to the manner of its observance, and that manner had prevailed to such an extent and for such a length of time as to become a custom of which railroad officials and employees had notice by reason of its notoriety, then plaintiff's compliance with the custom did not constitute negligence. Hence we hold that in either event plaintiff was not guilty of negligence.

II. It is contended by appellant, however, that if the time card rule be construed so as to authorize the engineer to pass through the Junction without coming to a full stop, if the initial switch lights are right and the signal shows white, that plaintiff is nevertheless, not entitled to recover because it was not shown that he approached the Junction with his train under full control.

The introduction of testimony to determine whether or not the train was under full control was not improper, and it was, therefore, permissible for

plaintiff and others to testify in regard
**Train:** thereto. [Railroad v. Mortenson, 27 Tex.
**Full Control:**
**Meaning.** Civ. App. 106.] Although the term
"full control" is terse and the ordinary
meaning of the words well understood, as applied to
the movement of a train its use is technical, and while
railroad operatives would doubtless well understand
it, a jury might not, and hence the necessity of its ex-
planation. Plaintiff testified that when within twelve
hundred or fourteen hundred feet of the station he re-
duced the speed of his train to twelve or fifteen miles
an hour, which would have enabled him to come to a
full stop in six hundred or seven hundred feet; upon
his seeing that the semaphore signal shone white, he
increased his speed, etc. The conductor of the train
testified that plaintiff had it under full control and
would have been enabled to come to a full stop before
striking the obstruction if the signal had not shone
white. Two brakemen testified to a like state of facts.
In addition to this testimony, the trial court, at the
request of the defendant, defined the meaning of the
term "full control" in the following instruction: "The
court instructs the jury that the term 'full control'
as used in these instructions, means such speed and
preparation for stopping as would enable a reasonably
competent and skilled engineer while in the exercise
of ordinary care, upon the first appearance of danger
reasonably to be expected, if any, or upon orders or
signals therefor, with reasonable safety to his train,
the employees and passengers thereon, to stop a train
of cars of like character, similarly equipped, operated
upon the same track, in the same direction and under
the same conditions at said time and place, before
reaching the point of danger so reasonably to be ex-
pected, if any." Not only, therefore, was the testi-
monly ample that the train was "under full control"
when approaching the Junction, as required by the
rule, but the trial court defined the term so clearly that

the jury could not have failed to understand its meaning. There is, therefore, no merit in this contention of defendant.

III. Appellant insists that error was committed in permitting Hoffman, the train dispatcher who had charge of the movement of trains on the division on which Cole Junction was located, to give his opinion as to whether plaintiff handled his train

Movement of Trains: Expert Testimony: Meaning of Dispatches, Signals, etc.

in the usual and proper manner. Hoffman was an expert. To him was entrusted, as is customary in the conduct of a railway's business, the directing of not only when trains should be run, but the manner in which they were to be run. He had before him, when on duty, a record of each train's orders, and its location, if moving under orders and the several operators had performed their respective duties. In the discharge, therefore, of his very responsible duty he knew the significance of train orders, signals and switch lights. The purpose of testimony is to enable a court or jury to fully understand the facts in a given case that the appropriate rules of law may be applied thereto. It was for this purpose that the testimony of this witness was offered; as to its practical value in enlightening the minds of the jury, take for example the evidence in reference to the message received by plaintiff at Tipton, that two certain trains had arrived at Cole Junction. In the absence of testimony given by Hoffman and other witnesses as to its meaning, viz., that it gave plaintiff's train the right of way, it would have had no material significance to the jury. For a like reason it was proper to permit this witness, plaintiff and other experienced railroad men, to testify as to the purpose and meaning of signals, switch lights and the usual and customary manner of running trains into the Junction. The rule is well established that the usual and ordinary manner of operating machinery,

in which we may properly include railroad trains, is a legitimate subject of expert evidence. [Combs v. Rountree Cons. Co., 205 Mo. 367; Ridenour v. Mines Co., 164 Mo. App. l. c. 592.] The testimony offered as to whose duty it was to throw the switch at the Junction, for river route trains, was necessary and proper to show the extent of the control exercised by the operator, and also, as a consequence, to show that he knew or should have known that a train was using the switch, and would set the signal accordingly. This fact being established, the inevitable moral conclusion follows that plaintiff was justified, as he contends, in relying upon the signal to determine if the track was clear.

IV. The correctness of the first instruction given by the court is challenged because the term "the orders to plaintiff and signals displayed authorized him," etc., is used therein, it being contended that no orders had been given or signals displayed, and that there was no evidence relative thereto. It was held in Carter v. Exposition Co., 124 Mo. App. l. c. 538, that the words "rule" and "order" were synonymous terms and included "commands," "instructions" and "directions." Plaintiff was operating his train in conformity with a rule which, being printed upon the time card, was ever with him and before him, for we will take judicial notice of the fact, if it does not appear in evidence, that all train operatives carry the current time card. If not acting under the requirements of this rule, and it had been abrogated by the establishment of a usage or custom which he observed, then this rule or its substituted custom, familiar to every operative from superintendent to section hand, had the practical force and effect of an order, and it is a mere tenuous technicality to contend that the use of the term was unauthorized. There is no difference in actual

*Meaning of Orders: Instructions.*

application between a rule and an order. Each emanates from a superior, and each directs a course of action to a subordinate. The words being synonymous, therefore, their use in the instruction was not error.

We have discussed the question as to the display of signals and observance of switch lights, and to avoid prolixity will only say that the ruling lights by which plaintiff was guided, under a wholesome and common-sense interpretation of the rules, were the switch lights at the approach of the Junction, and the semaphore light; but in short as to what were the ruling lights as applied to the operation of plaintiff's train was a question of fact for the jury. They have determined it, and we will not interfere with their finding. The evidence in regard to the manner in which the paramount rule was observed, whether in compliance with its terms or in such a manner as to work its abandonment or abrogation, has been fully discussed heretofore. There was evidence upon which either theory might be reasonably based. This being true, we are inclined to regard defendant's criticism of the second instruction given by the court as without substantial merit. The flippant fling at the witness McGinn in this connection is not warranted by the character of his testimony.

Instruction numbered one requested by defendant was properly refused, as there was evidence sufficient for the jury's consideration as to abandonment and abrogation of the time card rule.

Defendant's second requested instruction was properly refused, because under the testimony the telegram, which in effect told plaintiff that his train had the right of way between Cole Junction and Jefferson City, authorized him, the switch lights and signal being right, to "run the register" at the Junction, a fact disputed by the instruction.

Under the construction we have given the time card rule and Rule 98, defendant's fourth requested instruction was properly refused, and we will not burden this opinion with a further discussion of same, except to say, as heretofore said, that the evidence was much fuller at the trial of the instant case than at its former hearing.

V.   The judgment in this case is not excessive. The verdict of the jury was subject to this criticism, but the trial court finding, as we do, that **Excessive Verdict.** there was ample evidence to sustain a substantial claim for damages, in the absence of reversible error halved the verdict and entered judgment for plaintiff in the sum of twenty-five thousand dollars.   This was a just and fair disposition of the case which cannot but meet with the approval of any unbiased examiner of the facts.

Plaintiff was thirty-seven years of age when he received the injuries from the effect of which he is a permanent physical wreck, without earning capacity and compelled, on account of impaired eyesight, to grope his way through life, in daylight, as in darkness. At thirty-seven years of age one should be, and, so far as the record discloses, plaintiff was when injured, in the full flower of mature manhood; he was earning one hundred and seventy-five dollars per month in a calling which requires, at all times, a cool head, a steady hand and a devotion to duty scarcely required in.any of the other many responsible vocations in the industrial world; for eighteen consecutive years he had been in the employ of the defendant, half of this time as a locomotive engineer, and not a single mark of delinquency or dereliction of duty marred his escutcheon of service.   It may be said that this fact does not help to fix the amount of damages, because the material evidence in regard to the injury, and not plaintiff's past record, is the matter in issue.   As a general prop-

osition this is true, but where a case of this character presents a flawless trial record, convincing proof of plaintiffs' injuries and an absence of evidence of his negligence, it is not improper, as supplemental to the main facts, to admit proof of his efficiency and fidelity throughout the long term of his service—testimony of this character will, as it should, give moral effect and evidential force to the other facts and thereby assist in determining the amount of damages which should be awarded the plaintiff for the injuries sustained through the undenied negligence of defendant's operator whose duty it was to display the signals controlling plaintiff's actions. Other things being equal, it will scarcely be contended that the efficient and faithful are not entitled to be more substantially compensated when injured than those whose right is limited to life expectancy and earning capacity. Under this view the judgment rendered is not subject to just criticism.

However, it is but fair to defendant that the amount plaintiff is entitled to recover be measured by the usual standards. Plaintiff, as we have said, was thirty-seven years of age and earning when injured $175 per month; he might reasonably have looked forward to not less than fifteen years of active service, during which his income would not have been less than that stated; this would have enabled him to earn during the period of his activity a gross sum of thirty thousand dollars, or more than the amount he is awarded in this judgment.

Comparisons might be invoked to determine the reasonableness of this judgment because the books are replete with cases in which judgments for like amounts have been awarded for similar injuries, but we will not further extend the opinion in this regard, because the material affirmative facts here are sufficient to sustain the judgment without the aid that might be afforded by the citation of similar cases.

The trial courts are admonished by section 1850, Revised Statutes 1909, to disregard errors not affecting the substantial rights of the adverse party, and that no judgment should be reversed on account of such defect. A like injunction is laid upon us by section 2082, Revised Statutes 1909. We find no error affecting defendant's substantial rights here, and the judgment of the trial court should, therefore, be affirmed, and it is so ordered. *Brown* and *Bond, JJ.*, concur; *Lamm, C. J.*, concurs, but dissents from amount, and holds that amount of judgment should be $15,000. *Woodson, J.*, dissents in separate opinion. *Graves, J.*, dissents in separate opinion, in which *Faris, J.*, concurs.

BROWN, J.—I concur in the opinion of WALKER, J., and wish to recall what was said by me when the cause was here upon the first appeal. What I then wrote was based upon a misunderstanding of the facts of this case, and a partial misconception of the law applicable to such facts.

WOODSON, J.—Before the plaintiff would be entitled to a recovery in this case the jury were required to find that the defendant was guilty of the negligence charged in the petition, and that the plaintiff was not guilty of the contributory negligence stated in the answer.

Both of those facts were sharply presented by the pleadings, and there was much evidence introduced by the respective parties tending to prove each of those issues. Not only that, those facts should have been established to the reasonable satisfaction of the jury, solely by the evidence introduced—unbiased by hatred and ill-will, or passion and prejudice.

When I read this record as I did the record of the previous appeal, I became satisfied that the jury here, as there, was not solely governed by the evidence in the case, but largely by their prejudice and passion

against the defendant.  This is clearly manifested by the amount of the verdict ($50,000) and the readiness with which counsel consented to a remittitur of $25,000—one-half of the present verdict, and the full amount of the former.

I repeat here, that where the facts of a case are not conceded or agreed to and where the amount of the verdict, as here, so glaringly discloses the passion and prejudice of the jury against the defendant, we must presume that the same passion and prejudice also unjustly and improperly influenced the jury in passing upon the merits of the case, as well as influenced them in fixing the amount of their verdict.  In other words, that prejudice which caused the jury to improperly award the plaintiff three or four times as much as he was justly entitled to, if anything, did also in the very nature of man and things, improperly influence them in passing upon the merits of the case, namely, the question of the defendant's negligence, and the contributory negligence of the plaintiff.

If counsel may be permitted to appeal to the baser elements of man, and thereby procure a verdict upon the merits of the case, as well as for an unjust amount, and then remit a portion of the latter, then by indirection the prejudice and passion of the jury and not its sense of right and justice, would be permitted to meet out right and justice to their fellow-man.  And that too, with the sanction and approval of the courts of the land—the fountain-head of law and justice.

For one, I will never lend my sanction to such a monstrous proposition.

I had occasion to mention this matter in the case of Cook v. Globe Printing Co., 227 Mo. 471, l. c. 562; also in my dissenting opinion in this case when here on the former appeal, 244 Mo. 608, l. c. 662.

If counsel will persist in this unjust practice I see no other remedy but to reverse the judgment just so often as the record discloses that abuse of authority.

Counsel should remember that they are officers of the court and have a duty to perform for the State, just as the court has; both are equally interested in the orderly administration of the law, which would be difficult to do without the hearty co-operation of court and counsel.

Of course I recognize that counsel, at times, in the heat and excitement of a trial says and does things which would not be said or done in calmer moments, yet where those things do occur to the injury to either party litigant, it then becomes the duty of the court to correct the injury by such action as may be necessary to accomplish that end; and in this particular case I believe justice will be best served by reversing the judgment and remanding the cause for another trial.

Now, I am not overly sensitive regarding large verdicts and judgments, provided they are commensurate with the injuries sustained. This is evidenced by the fact that the writer has heretofore written the opinions in three or more cases wherein the verdicts of the jury are the largest (if my memory correctly serves me) ever approved by this court.

In a court of justice, justice, right and equity should be judicially administered, not only as to the amount involved, but also as to the merits of the case. The latter constitutes the foundation upon which the former is predicated; and if the foundation is founded upon sand then the fruits of the temple of justice must fall.

GRAVES, J.—Upon the questions discussed in the previous opinions of Judge BROWN (244 Mo. 643-647) and myself (244 Mo. 616-641) in this case, the record now before us has not so changed the facts as to destroy the legal conclusions there reached. Those opinions can be read as my dissent in this case, and

261Mo33

the more curious can read the two records. *Faris, J.,* concurs in these views.

PER CURIAM.—The attitude of the court on the foregoing opinion is defined by the votes of the respective judges thereto appended.

Since the opinion was written, the parties litigant have entered into and filed in this court a stipulation in the words following, to-wit:

"It is stipulated and agreed in the above case that judgment shall be rendered in the Supreme Court in favor of the plaintiff and against the defendant in the sum of ten thousand dollars, and that said judgment shall not draw interest until the first of January, 1915, and that the defendant shall have until on or before the first of January, 1915, to pay said judgment, and if the same is not paid on or before the first of January, 1915, said judgment shall draw interest at six per cent therefrom, and that none of the existing rights of the plaintiff against the sureties on the appeal bond of the defendant shall be affected by this stipulation or judgment.

"It is further understood that the defendant is to pay the costs in the trial court except the plaintiff's witness fees, which are to be offset against the costs recovered by the defendant in this court in the former appeal."

It is therefore ordered that the judgment of the trial court be affirmed and that the damages therein be assessed at the sum of ten thousand dollars on the conditions named in said stipulation.